In the Matter of UNITED PRESS ASSOCIATIONS et al., Appellants, against FRANCIS L. VALENTE, Individually and as Judge of the Court of General Sessions of the County of New York, Respondent.

Argued November 16, 1953; decided December 31, 1954.

*Thomas A. Diskin, Harry H. Van Aken, C. Coudert Nast* and *William E. Flannery* for United Press Associations, appellant. I. Petitioners are entitled to an order of prohibition as a matter of right. (*Matter of Ryan [Hogan]*, 306 N. Y. 11; *Matter of Hogan* v. *Court of Gen. Sessions*, 296 N. Y. 1; *People ex rel. Jerome* v. *Court of Gen. Sessions*, 185 N. Y. 504; *Matter of Public Service Comm.* v. *Norton*, 304 N. Y. 522; *People ex rel. Livingston* v. *Wyatt*, 186 N. Y. 383; *Matter of Baltimore Mail S. S. Co.* v. *Fawcett*, 269 N. Y. 379; *Matter of Shortridge*, 99 Cal. 526; *Matter of Hogan* v. *Bohan*, 305 N. Y. 110; *Northrup* v. *People*, 37 N. Y. 203.) II. Petitioners' rights, guaranteed by the Constitutions of the United States and the State of New York, were violated. (*Grosjean* v. *American Press Co.*, 297 U. S. 233; *Near* v. *Minnesota*, 283 U. S. 697; *Craig* v. *Harney*, 331 U. S. 367; *Bridges* v. *California*, 314 U. S. 252; *Thomas* v. *Collins*, 323 U. S. 516; *Marlin Fire Arms Co.* v. *Shields*, 171 N. Y. 384; *People* v. *Hall*, 51 App. Div. 57; *Lee* v. *Brooklyn Union Pub. Co.*, 209 N. Y. 245.)

*E. Douglas Hamilton, Stanley D. Brown* and *John G. McCarthy* for New York Herald Tribune, Inc., appellant. I. Respondent had no power to make the order of exclusion. (*Lilburne's Trial*, 4 How. St. Tr. 1270; *Scott* v. *Scott*, [1913] A. C. 417; *Matter of Oliver*, 333 U. S. 257; *State* v. *Holm*, 67 Wyo. 360; *Craig* v. *Harney*, 331 U. S. 367; *People* v. *Hall*, 51 App. Div. 57; *State* v. *Keeler*, 52 Mont. 205; *People* v. *Miller*, 257 N. Y. 54; *Tanksley* v. *United States*, 145 F. 2d 58; *United States* v. *Kobli*, 172 F. 2d 919.) II. Petitioners have a mature legal right which was violated by respondent's order of exclusion. (*Lee* v. *Brooklyn Union Pub. Co.*, 209 N. Y. 245; *Maryland* v. *Baltimore Radio Show*, 338 U. S. 912; *Matter of Shortridge*, 99 Cal. 526; *State* v. *Hensley*, 75 Ohio St. 255; *Bridges* v. *California*, 314 U. S. 252.) III. Prohibition was the proper and only remedy and should have been granted. (*Matter of Public Service Comm.* v. *Norton*, 304 N. Y. 522; *Matter of Hogan* v. *Bohan*, 305 N. Y. 110; *People ex rel. Jerome* v. *Court of Gen. Sessions*, 185 N. Y. 504; *Matter of Baltimore Mail S. S. Co.* v. *Fawcett*, 269 N. Y. 379.)

*Charles Henry* and *Harvey L. Lipton* for Hearst Corporation and another, appellants. I. The order of respondent was in excess of his power. (*Tanksley* v. *United States,* 145 F. 2d 58; *United States* v. *Kobli,* 172 F. 2d 919; *People* v. *Murray,* 89 Mich. 276; *State* v. *Beckstead,* 96 Utah 528; *People* v. *Hartman,* 103 Cal. 242; *People* v. *Letoile,* 31 Cal. App. 166; *Stewart* v. *State,* 18 Ala. App. 622; *Rhoades* v. *State,* 102 Neb. 750; *State* v. *Keeler,* 52 Mont. 205; *Matter of Oliver,* 333 U. S. 257.) II. Assuming exclusion a matter of judicial discretion, respondent grossly exceeded any discretion he may have had.

*J. Howard Carter, James W. Rodgers, John R. Schoemer, Jr.,* and *Andrew L. Hughes* for News Syndicate Co., Inc., appellant. I. Respondent did not have the power to make the exclusion order. (*Matter of Oliver,* 333 U. S. 257; *Scott* v. *Scott,* [1913] A. C. 417; *Lee* v. *Brooklyn Union Pub. Co.,* 209 N. Y. 245; *Maryland* v. *Baltimore Radio Show,* 338 U. S. 912; *Aultman & Taylor Co.* v. *Syme,* 163 N. Y. 54; *Matter of Shortridge,* 99 Cal. 534; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Near* v. *Minnesota,* 283 U. S. 697.) II. Petitioners' rights, independently of Jelke's rights, were infringed by respondent's order. (*Shelley* v. *Kraemer,* 334 U. S. 1; *A. F. of L.* v. *Swing,* 312 U. S. 321; *Bridges* v. *California,* 314 U. S. 252; *Ex Parte Virginia,* 100 U. S. 339; *Twining* v. *New Jersey,* 211 U. S. 78; *Grosjean* v. *American Press Co.,* 297 U. S. 233; *Near* v. *Minnesota,* 283 U. S. 697; *Lovell* v. *Griffin,* 303 U. S. 444.) III. Prohibition lies to prevent the exercise of unauthorized power and is the only remedy available to petitioners. (*Quimbo Appo* v. *People,* 20 N. Y. 531; *Matter of Culver Contr. Corp.* v. *Humphrey,* 268 N. Y. 26; *Matter of Public Service Comm.* v. *Norton,* 304 N. Y. 522; *Matter of Baltimore Mail S.S. Co.* v. *Fawcett,* 269 N. Y. 379.) IV. Petitioners are entitled to maintain this proceeding. (*Matter of Public Service Comm.* v. *Norton,* 304 N. Y. 522; *Matter of Culver Contr. Corp.* v. *Humphrey,* 268 N. Y. 26; *Matter of Andresen* v. *Rice,* 277 N. Y. 271; *Matter of Zielinski* v. *Harding,* 177 Misc. 773; *Nowack* v. *Fuller,* 243 Mich. 200; *Bend Pub. Co.* v. *Haver,* 118 Ore. 105; *Holcombe* v. *State,* 240 Ala. 590; *Providence Journal Co.* v. *McCoy,* 94 F. Supp. 186, 190 F. 2d 760, 342 U. S. 894.)

*M. Marvin Berger* for New York Post Corporation, appellant. I. Respondent had no power to issue the order of exclusion. (*People* v. *Miller,* 257 N. Y. 54; *People* v. *Hall,* 51 App. Div. 57; *United States* v. *Kobli,* 172 F. 2d 919; *State* v. *Holm,* 67 Wyo. 386; *Tanksley* v. *United States,* 145 F. 2d 58; *State* v. *Keeler,* 52 Mont. 205; *Lilburne's Trial,* 4 How. St. Tr. 1270; *Scott* v. *Scott,* [1913] A. C. 417; *Rex* v. *Governor of Lewes, Ex Parte Doyle,* [1917] K. B. 2; *McPherson* v. *McPherson,* L. J. [P. C.] 105.) II. Assuming without admitting the power of the court to order exclusion, its exercise in the instant case was in excess of his judicial function. (*Craig* v. *Harney,* 331 U. S. 367.) The exclusion order violated petitioners' rights to gather and report news. (*Bridges* v. *California,* 314 U. S. 252; *Grosjean* v. *American Press Co.,* 297 U. S. 233; *Near* v. *Minnesota,* 283 U. S. 697; *Matter of Andresen* v. *Rice,* 277 N. Y. 271; *Matter of Culver Contr. Corp.* v. *Humphrey,* 268 N. Y. 26; *People ex rel. Pumpyansky* v. *Keating,* 62 App. Div. 348, 168 N. Y. 390; *Matter of Zielinski* v. *Harding,* 177 Misc. 733.)

*Charles Ballon, Howard M. Squadron* and *Jacob M. Usadi* for New York Civil Liberties Union, *amicus curiæ,* in support of appellants' position. I. Public access to information is the basis for the fundamental rights of the Bill of Rights. (*Pennekamp* v. *Florida,* 328 U. S. 331.) II. The public, as well as the accused, has a constitutional interest in a public trial. (*Lilburne's Trial,* 4 How. St. Tr. 1270; *Tanksley* v. *United States,* 145 F. 2d 58; *Daubney* v. *Cooper,* 10 B & C 237; *Scott* v. *Scott,* [1913] A. C. 417; *Williamson* v. *Lacey,* 86 Me. 80; *State* v. *Copp,* 15 N. H. 212; *United States* v. *Kobli,* 172 F. 2d 919.) III. The Fourteenth Amendment renders the public trial guarantee of the Bill of Rights applicable to citizens of the States. (*Betts* v. *Brady,* 316 U. S. 455; *Matter of Oliver,* 333 U. S. 257.) IV. Respondent's order violated the public trial requirement of the Sixth Amendment to the Federal Constitution. (*Tanksley* v. *United States,* 145 F. 2d 58; *People* v. *Kerrigan,* 73 Cal. 222; *Lide* v. *State,* 133 Ala. 63; *State* v. *Scruggs,* 165 La. 842; *State* v. *Genese,* 102 N. J. L. 114; *State* v. *Brooks,* 92 Mo. 542; *Jackson* v. *Commonwealth,* 100 Ky. 239; *Kugadt* v. *State,* 37 Tex. Cr. Rep. 681; *People* v. *Greeson,* 230 Mich. 124; *Grimmet* v. *State,* 22 Tex. Cr. Rep. 36.) V. The accused cannot waive the public's

right to a public trial. (*Nagle-Gillman* v. *Christopher*, 4 Ch. D. 174.) VI. The public's constitutional right to know is protected by the freedom of press guarantee. (*Grosjean* v. *American Press Co.*, 297 U. S. 233; *United States* v. *Associated Press*, 52 F. Supp. 362; *Lovell* v. *Griffin*, 303 U. S. 444; *Bridges* v. *California*, 314 U. S. 252.) VII. The First Amendment is made applicable by the Fourteenth Amendment to respondent's order. (*Shelley* v. *Kraemer*, 334 U. S. 1; *Near* v. *Minnesota*, 283 U. S. 697; *Grosjean* v. *American Press Co.*, 297 U. S. 233; *De Jonge* v. *Oregon*, 299 U. S. 353.) VIII. Respondent's order is a classic example of an unconstitutional " prior restraint ". (*Winters* v. *New York*, 333 U. S. 507; *Craig* v. *Harney*, 331 U. S. 367.)

*Frank S. Hogan, District Attorney* (*Richard G. Denzer, Charles W. Manning* and *Stuart G. Schwartz* of counsel), for respondent. I. Petitioners had no status to institute the present proceeding. (*Matter of Oliver*, 333 U. S. 257; *People* v. *Hall*, 51 App. Div. 57; *Dutton* v. *State*, 123 Md. 373; *People* v. *Miller*, 257 N. Y. 54; *McPherson* v. *McPherson*, 1 Dom. L. Rep. 321; *Scott* v. *Scott*, [1913] A. C. 417; *Cornish's Trial*, 11 How. St. Tr. 460; *Wade* v. *State*, 207 Ala. 1; *People* v. *Hartman*, 103 Cal. 242; *State* v. *Beckstead*, 96 Utah 528.) II. The motion lacked merit in that the exclusion order constituted a ruling which respondent had power to make. (*Matter of Hogan* v. *Court of Gen. Sessions*, 296 N. Y. 1; *People ex rel. Livingston* v. *Wyatt*, 186 N. Y. 383; *Danziger* v. *Hearst Corp.*, 304 N. Y. 244; *Hanna* v. *Mitchell*, 202 App. Div. 504, 235 N. Y. 534; *People* v. *Buck*, 46 Cal. App. 2d 558; *Reagan* v. *United States*, 202 F. 488; *Myers* v. *State*, 97 Ga. 76; *State* v. *Brooks*, 92 Mo. 542; *State* v. *Holm*, 67 Wyo. 360; *People* v. *Tugwell*, 32 Cal. App. 520.) III. Regardless of the questions of petitioners' status and of respondent's power to exclude, the order of Special Term constituted a proper exercise of that court's discretion and should not be disturbed. (*People ex rel. Livingston* v. *Wyatt*, 186 N. Y. 383; *People ex rel. Rothensies* v. *Searles*, 229 App. Div. 603; *People ex rel. Howard* v. *Searles*, 229 App. Div. 819; *Matter of Dodge* v. *Supreme Court*, 249 App. Div. 103, 276 N. Y. 444; *People ex rel. McManus* v. *Warden of City Prison*, 226 App. Div. 364; *People* v. *Cunningham*, 3 Parker Cr. Rep. 531; *People* v. *Ackerson*, 166 Misc. 130; *People ex rel. Ackerson* v. *Warden of*

*City Prison,* 167 Misc. 475; *People ex rel. Glendening* v. *Glendening,* 259 App. Div. 384; *People ex rel. Cuvillier* v. *Hagarty,* 238 N. Y. 621.)

FULD, J.   Decision in this case has been held up for some months to permit the appeal in *People* v. *Jelke* to reach us and be argued; it has now been heard and, indeed, decided today. Both that case and this one involve the order made by Judge VALENTE excluding the general public and the press from the courtroom during a large part of the trial.

In *People* v. *Jelke* (308 N. Y. 56), the question presented was whether that exclusionary order operated to deprive defendant Jelke of his right to a public trial.   We held that it did.   On this appeal, the issue is whether members of the public at large, including the press, also possessed an enforcible right of their own to insist that Jelke's trial be open to the public.

The pertinent facts are stated in the opinion in the *Jelke* case (*supra,* 308 N. Y. 56) and there is no reason to set them forth again.   Petitioners, comprising a number of press associations and newspaper publishers, were, by reason of the order barring public and press, denied admittance to the trial during the presentation of the People's case.   To restrain the trial judge from carrying out that order, they instituted this article 78 proceeding in the Supreme Court.   The application was denied at Special Term, and the Appellate Division affirmed by a divided court.

Although the district attorney has appeared on behalf of Judge VALENTE, neither defendant Jelke nor the People or the district attorney is a party to this proceeding.   And, despite the fact that the criminal trial was concluded, and Jelke convicted, some two months prior to the Appellate Division's decision in this proceeding, petitioners reached this court before the accused's own appeal could be heard in the Appellate Division.

Since the problem presented and the principle involved are of importance in the administration of the criminal law, we deem it appropriate to entertain the appeal rather than to dismiss it upon the ground that it has become moot.   (See *Matter of Rosenbluth* v. *Finkelstein,* 300 N. Y. 402, 404; *Matter of Glenram Wine & Liq. Corp.* v. *O'Connell,* 295 N. Y. 336, 340; see, also, Cohen and Karger, Powers of the New York Court of Appeals, pp. 420, 421.)

It is well, at the outset, to emphasize that this is not a case of free speech or freedom of the press and that the right asserted by petitioners is not embraced within the constitutional provision guaranteeing those freedoms. (U. S. Const., 1st Amendt.; N. Y. Const., art. I, § 8.) The courts have ever been alert to strike down any infringement or limitation upon the fundamental right of the press freely to publish and distribute news and comments (see, e.g., *Near* v. *Minnesota,* 283 U. S. 697; *Lovell* v. *Griffin,* 303 U. S. 444; *Bridges* v. *California,* 314 U. S. 252; *Craig* v. *Harney,* 331 U. S. 367), and we certainly have no disposition or purpose to undermine or minimize it. That right has, however, never been held to confer upon the press a constitutionally protected right of access to sources of information not available to others. Judicial proceedings are viewed as " a public event ", in the sense that " Those who see and hear what transpired can report it with impunity." (*Craig* v. *Harney, supra,* 331 U. S. 367, 374.) But freedom of the press is in no way abridged by an exclusionary ruling which denies to the public generally, including newspapermen, the opportunity to " see and hear what transpired ". In line with that thinking, we recently upheld the validity of a court rule (Rules Civ. Prac., rule 278) restricting access by persons, who are not parties, to the filed pleadings or testimony in matrimonial actions. (See *Danziger* v. *Hearst Corp.,* 304 N. Y. 244.) In so doing, we specifically rejected the contention that such provisions were violative of freedom of the press, and we observed that there are a number of other areas in which preservation of secrecy has similarly been directed by the legislature in respect of court records. (See *Danziger* v. *Hearst Corp., supra,* 304 N. Y. 244, 248, 249; cf. Code Crim. Pro., §§ 262–264, 913-f, 952-t; Judiciary Law, § 90, subd. 10; N. Y. City Dom. Rel. Ct. Act, § 52; Mental Hygiene Law, § 74, subd. 6.)

We turn, then, to the claim that the right here asserted has been granted by statute. As we have already noted in deciding *People* v. *Jelke,* there are three pertinent statutory provisions. Two of them are applicable only to criminal prosecutions and confer the right of public trial upon the defendant (Code Crim. Pro., § 8; Civil Rights Law, § 12). The third provision, section 4 of the Judiciary Law, is more broadly worded and declares, subject to certain stated exceptions, that, " The

sittings of every court within this state shall be public, and every citizen may freely attend the same ''. It is on this latter provision that petitioners primarily rely. All three statutory provisions were derived from the revised statutes of 1829. That no drastic change was intended by enactment of the forerunner of section 4 of the Judiciary Law is established by the Revisers' note that it was merely '' Declaratory of the existing law.'' (See Revisers' Notes to Rev. Stat. of N. Y. [1829], part III, ch. III, tit. I, § 1, found in Reports to Legislature by N. Y. Comrs. to Revise Statutes [1828], as well as in 3 Rev. Stat. [2d ed., 1836], Appendix, p. 694.)

Insofar as the statute called for '' public sittings,'' it was merely a restatement, in terms of general application, of the public trial guarantee, also contained in the other two provisions. As to the further specification that '' every citizen may freely attend '' the sessions of the court, it is a fair deduction that, when enacted in 1829, it was merely intended as a recognition of the ancient rule — reflected, indeed, in an early New York statute (L. 1684, ch. 19; 1 Colonial Laws of New York [1894], pp. 159–160) — respecting freedom from arrest of all persons *voluntarily* attending court on court business. (See, e.g., Lambard, Eirenarcha [1588], pp. 397–398; 3 Burn, Justice of the Peace [4th ed., 1757], p. 274; 4 *id.* [19th ed., 1800], p. 274; Ladd, Burn's Abridgment or the American Justice [N. H., 1792], p. 371; Conductor Generalis, Compiled Chiefly from Burn's Justice [N. Y., 1794], p. 318; 2 Bacon, Abridgment of the Law [1st Am. ed., 1811], p. 108.)[1] Thus, we find it said as early as 1588 by Lambard in his Eirenarcha (*op. cit.*, pp. 397–398):

" And now, as all these [Grand Jurors] owe their service at the Sessions, either by reason of their office, or by vertue of the Summons: *So all others also may freely attend there,* if not for any thing that specially concerneth themselves, yet for the advancement of publique Justice, and for the service of the

1. The provision (2 Rev. Stat. [1829], part III, ch. VII, tit. III, § 51, now Civil Rights Law, § 25), to which Judge FROESSEL refers in his opinion (p. 90), dealt only with the privilege from arrest of persons *compelled to attend as witnesses* pursuant to subpœna or order, and not with the freedom of access of those *voluntarily present* on court business. Accordingly, that provision cannot possibly cast doubt upon the meaning or significance of the phrase under consideration.

Queene. And to this end, they are invited thither (as I may say) by *a certaine freedome of accesse,* and by protection from common arrest: a thing, that is incident to each court of Record, and without the which, Justice should be greatly hindered. So that, *if a man come voluntarily to these Sessions,* with the mind, either to preferre any bill of Enditement, or to give information against another: or to tender a fine upon an Enditement, touching himselfe: or do come compelled to make apparaunce for the saving of his bond, and be arrested by the Shirife upon common and originall processe, in his coming thither, or during his tarying there: it seemeth that (upon examination of the matter under his oath) he shall be dismissed thereof by the privilege of this Court, even as it is used in the higher Courts at Westminster.'' (Emphasis supplied.) This statement is repeated, almost word for word, in Burn *(loc. cit.)*, an English work which not only enjoyed a wide circulation in this country in colonial days, but was reproduced in abridged form in New Hampshire, in 1792 (Ladd, *loc. cit.*), and in this state, in Albany, in 1794 (Conductor Generalis, *loc. cit.*) ; and the relevant passage appears in both of these books.

As is thus manifest, the assurance that all persons '' may freely attend '' court sittings had nothing to do with attendance of citizens or members of the public simply as spectators, but was rather designed to afford ''a certaine freedome of accesse,'' a protection from arrest, to those whose presence was essential for the disposition of the work of the court.

Fifty years after the passage of the Revised Statutes, the provision in question was amended to add the following italicized language (L. 1879, ch. 210) :

'' The sittings of every court within this State shall be public, and every citizen may freely attend the same, *except that in all proceedings and trials in* [*certain specified*] *cases* * * * *the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court.*''

It seems almost self-evident that the '' except '' clause related to the first part of the statute — that the sittings of the court shall be '' public '' — rather than to the second part. The guarantee of '' free '' attendance by citizens having business before the

court remained unaffected. The only change consisted in qualifying the public trial principle to the extent of authorizing the court in a proper case — one of those enumerated — to exclude members of the general public. Consequently, in considering whether a stranger to the action has a right, which he may assert in court, to demand that the trial be open to the public, we misread the statute if we focus attention on the words " every citizen may freely attend " the court sessions. And, even if those words were to be given a broader construction than their historical background indicates and justifies, they would at most serve merely as a definition of the public trial concept. (See *People* v. *Murray,* 89 Mich. 276, 286.)

Our inquiry must necessarily be, therefore, whether the guarantee that a trial shall be " public " — found in all three statutes, the Code of Criminal Procedure, the Civil Rights Law and the Judiciary Law — creates an enforcible right in a member of the general public.

While various purposes have been attributed to the doctrine of public trial in criminal cases, its primary function has traditionally been regarded as that of safeguarding the accused against possible unjust persecution and abuse of judicial authority and of assuring him a fair trial. (See *People* v. *Jelke, supra,* 308 N. Y. 56, 62; *Matter of Oliver,* 333 U. S. 257, 268–271; see, also, 1 Cooley, Constitutional Limitations [8th ed., 1927], p. 647.) " The requirement of a public trial," Cooley has written (*loc. cit.*) " is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned ".

We have said, though in an entirely different connection, that section 4 of the Judiciary Law indicates a " public interest " in having court proceedings " public " (see *Lee* v. *Brooklyn Union Pub. Co.,* 209 N. Y. 245, 248), and that is so. But the language there used — to which Judge FROESSEL refers (opinion, p. 92) — did not, and could not, mean that the right declared may be invoked by anyone other than the particular litigant, the accused in a criminal prosecution and either party in a civil case, for whose protection it has been primarily provided.

The public does unquestionably have an interest in seeing that every person accused of crime shall have a fair trial and not

denied any of the guarantees designed for his protection. That is true, not only of the guarantee of public trial, but also of other privileges equally basic, such as the defendant's right to trial by jury (N. Y. Const., art. I, § 2), his right to the assistance of counsel (N. Y. Const., art. I, § 6) and his right to be confronted by the witnesses against him (N. Y. Const., art. I, § 6). "While all of these rights are in a broad sense for the protection of the public generally they are in a very special sense privileges accorded to the individual member of the public who has been accused of crime." (*United States* v. *Sorrentino,* 175 F. 2d 721, 722–723.) It is for the defendant alone to determine whether, and to what extent, he shall avail himself of them. To permit outsiders to interfere with the defendant's own conduct of his defense would not only upset the orderly workings of the judicial process, but could well redound to the defendant's exceeding prejudice.

The public's interest is adequately safeguarded as long as the accused himself is given the opportunity to assert on his own behalf, in an available judicial forum, his right to a trial that is fair and public. The accused's defense is, in the very nature of things, more than likely to be adequate. Whatever concern the public may have for a defendant's right to a fair trial, it can seldom match that of the person whose life or liberty is at stake. The defense may, it is true, sometimes be inept, but for that there are other remedies than delegating, to persons not directly concerned, the authority to control the course of the proceedings. As long as the defendant is assured the right to invoke the guarantees provided for his protection, the public interest is safe and secure, and there is neither need nor reason for outsiders to interject themselves into the conduct of the trial.

Actually, petitioners are seeking to convert what is essentially the right of the particular accused into a privilege for every citizen, a privilege which the latter may invoke independently of, and even in hostility to, the rights of the accused. A moment's reflection is enough, we suggest, to demonstrate that that cannot be, for it would deprive an accused of all power to waive *his* right to a public trial and thereby prevent him from taking a course which he may believe best for his own interests. And, in point of fact, just as there may be a waiver of other funda-

mental rights — such as the right to trial by jury (N. Y. Const., art. I, § 6), the right to counsel (see *People* v. *Palmer,* 296 N. Y. 324), the right to confrontation by witnesses (see *People* v. *Sugarman,* 248 N. Y. 255, 258) and the guarantee against unreasonable searches and seizures (see *People* v. *Sieke,* 222 N. Y. 611) — so, this court has held, there may be a waiver by the defendant of his right to a public trial. (See *People* v. *Miller,* 257 N. Y. 54, 60–61.) [2] And the same view prevails in other jurisdictions. (See *United States* v. *Sorrentino, supra,* 175 F. 2d 721; *Keddington* v. *State,* 19 Ariz. 457, 462; *People* v. *Swafford,* 65 Cal. 223, 224; *People* v. *Stanley,* 33 Cal. App. 624; *Benedict* v. *People,* 23 Col. 126, 129; *Henderson* v. *State,* 207 Ga. 206; *Dutton* v. *State,* 123 Md. 373; see, also, *Gibson* v. *United States,* 31 F. 2d 19, 22; *Irwin* v. *State,* 220 Ind. 228, 238; *State ex rel. Baker* v. *Utecht,* 221 Minn. 145, 149; *State* v. *Keeler,* 52 Mont. 205, 216; *State* v. *Smith,* 90 Utah, 482, 491–492.) A regard, not alone for reason and logic, but for justice and fairness to the defendant, dictates the conclusion that, subject to the court's approval and ruling, he be allowed to decide against having a public trial. As one United States Court of Appeals aptly wrote, " a defendant may well conclude that in his particular situation his interests will be better served by foregoing the privilege than by exercising it ", and " To deny the right of waiver in such a situation would be ' to convert a privilege into an imperative requirement ' to the disadvantage of the accused." (*United States* v. *Sorrentino, supra,* 175 F. 2d 721, 723.)

While publicity ordinarily serves to assure a fair trial, the defendant may determine reasonably and sensibly that he will be able to secure such a trial only by limitation of the number of spectators — where, for example, a particular crime has

2. *Matter of Rudd* v. *Hazard* (266 N. Y. 302) is not to the contrary. All that was there decided was that a special county judge acted without jurisdiction in accepting a plea of guilty by the defendant in a criminal case, where the proceedings were not held at a regularly constituted session of the county court, and that jurisdiction was not conferred by the voluntary appearance of the parties involved. No issue was presented as to whether a defendant could waive the right of public trial at a duly constituted session of the court, and there was certainly no intention to overrule the *Miller* case (*supra,* 257 N. Y. 54), where it was in fact decided that a defendant's failure to object in the trial court to an order of exclusion constituted a waiver.

aroused intense feeling in the community. (Cf. *Moore* v. *Dempsey,* 261 U. S. 86.) There can be no warrant or justification for denying the defendant the privilege of waiving his right to a public trial in such a case. Yet, if petitioners were correct in their position, it would mean, most anomalously, that, although the defendant consents to forego his privilege, the court would be powerless to exclude the general public, even where necessary to assure the defendant a fair trial, as long as any individual demanded that the court be kept open.

Still another strange consequence of petitioners' position would be to permit the defendant's rights to be determined in proceedings in which he was not a party and had no voice, as exemplified by the very case before us. Thus, by the dispatch with which they acted in bringing this article 78 proceeding and in appealing from the orders below, petitioners reached this court before the accused's own appeal was heard even in the Appellate Division. Raising the issue, by their appeal, that Jelke's trial was not a public one, petitioners sought, in effect, to have us pass upon the merits of his appeal although he could not be heard. There is something essentially wrong and unreasonable about a procedure that permits such a result.

Petitioners' interpretation of the statute would also mean that any person denied access to a courtroom, no matter what the reason, could challenge the court's authority and seek to stay further proceedings until his asserted right to be present had been finally passed upon. The trial court's inherent authority to limit public attendance in certain situations in the interests of sound judicial administration is well settled. (See *People* v. *Jelke, supra,* 308 N. Y. 56, 63; see, also, *People* v. *Murray, supra,* 89 Mich. 276, 286, 291.) Nevertheless, if every member of the public were free to challenge any order of exclusion made in the exercise of such authority, the courts might well be overwhelmed with a host of collateral proceedings.

The harsh and burdensome consequences that would thus ensue from the interpretation urged by petitioners afford persuasive evidence that the legislature never intended to confer an enforcible right of attendance upon every individual member of the public. " It is always presumed, in regard to a statute," we have said (*Matter of Meyer,* 209 N. Y. 386, 389), " that no unjust or unreasonable result was intended by the legislature."

And, where adherence to the statute's letter produces such a result, it is settled that " To effect the intention of the legislature the words of a single provision may be enlarged or restrained in their meaning and operation, and language general in expression may be subjected to exceptions through implication." (209 N. Y., at pp. 389–390; see *Surace* v. *Danna,* 248 N. Y. 18, 21; *People* v. *Santoro,* 229 N. Y. 277, 281–282.) Just as the language of the statute may not be read to deny to the trial court the authority to exclude individual members of the public from the courtroom under any and all circumstances (see *People* v. *Jelke, supra,* 308 N. Y. 56, 63), so we may not assume that the legislature intended to give to each and every outsider the power to control the exercise of rights guaranteed to the accused for his own protection.

It is suggested that the statute was designed to prevent the defendant himself from seeking a secret trial in order to obtain some unfair advantage (opinion of FROESSEL, J., p. 93). That view, however — without support either in the background of the statutes or in their legislative history — would actually require overruling our decision in *People* v. *Miller* (*supra,* 257 N. Y. 54, 60–61) that the right of public trial is one that may be waived. And, quite apart from that, we may not interpret a provision, which its drafters described as merely " Declaratory of the existing law ", in such a way as to import into the statute so drastic a new consequence as interference with the defendant's free exercise of his rights. The asserted danger, far from ever looming large in our judicial history, has never been a cause for serious concern. What is even more to the point, the public interest is adequately protected — the fear that an accused may succeed in having the courtroom closed to the prejudice or disadvantage of that public interest, reduced to a minimum — by virtue of the trial judge's power to refuse defendant's application, if the judge concludes that the case is not an appropriate one for exclusion of the public.

In any event, even if the statute were to be interpreted as granting the public a right distinct from that given to the defendant, it is at most a right conferred on the public at large and not on any individual member thereof. (See *State* v. *Copp,* 15 N. H. 212, 215; cf. *Frothingham* v. *Mellon,* 262 U. S. 447, 487.) Petitioners quite obviously have no personal or property rights

which could be affected by this proceeding. Their only interest in the case is that which is common to the public as a whole, rather than the individual interest which is requisite for standing in court. (See *Morrell* v. *Brooklyn Borough Gas Co.,* 231 N. Y. 405, 408–409; *Schieffelin* v. *Komfort,* 212 N. Y. 520, 530; *People* v. *Fisher,* 209 N. Y. 392, 394; *Roosevelt* v. *Draper,* 23 N. Y. 318, 323.)

Most pertinently, this court pointed out in the *Fisher* case (*supra,* 209 N. Y. 392, 394), "it would lead to intolerable abuses if persons interested only in the question to be decided were allowed to intervene and interfere with the conduct of the cause." And, as we have held in somewhat analogous situations, enactments which at most confer rights or benefits on the public at large "do not import intention to protect the interests of any individual except as they secure to all members of the community the enjoyments of rights and privileges to which they are entitled only as members of the public." (*Steitz* v. *City of Beacon,* 295 N. Y. 51, 56, and cases there cited.)

The fact that petitioners are in the business of disseminating news gives them no special right or privilege, not possessed by other members of the public. Since the only rights they assert are those supposedly given "every citizen" to attend court sessions (Judiciary Law, § 4), they are in no position to claim any right or privilege not common to "every [other] citizen". Any incidental financial benefit, which they might have derived from the opportunity to report the full proceedings at the Jelke trial, can give them no greater status than they would otherwise have had.

Accordingly, although we have held that Judge VALENTE's order deprived defendant Jelke of his right to a public trial (*People* v. *Jelke, supra,* 308 N. Y. 56), our conclusion on this appeal is that it did not deprive petitioners of any right or privilege of which they may complain.

The order of the Appellate Division should be affirmed, with costs.

DESMOND, J. (concurring). I concur for affirmance, but in the result only, my views on the questions of law being as follows:

1. *As to whether the first part of section 4 of the Judiciary Law expresses a private right and a right to sue for its enforcement.* Since 1829, this statute has ordained that: "The sittings

of every court within this state shall be public, and every citizen may freely attend the same ''. It is beyond my comprehension why such language should need any interpretation at all. I think it means just what it says (*McCluskey* v. *Cromwell,* 11 N. Y. 593, 601; *Matter of Rathscheck,* 300 N. Y. 346, 350). The next inquiry is: may a citizen, refused admission to a courtroom, sue to enforce his right to attend? Again, the statutory language is so utterly clear that there should be no construction problem at all. It is in no wise pertinent that in cases like *Steitz* v. *City of Beacon* (295 N. Y. 51) and *Bull* v. *Stichman* (298 N. Y. 516), we held that the particular rights there asserted were '' public '' ones only and that no individual citizen could sue to redress their alleged violation. The right freely to attend the sittings of our courts has been, in terms, granted to ''every citizen '', and if that be not a grant of an individual personal right to ''every citizen '', then words have lost their meaning. A citizen who is refused admission to a courtroom is denied the exact same kind of right as one turned away from a public park or schoolroom. Certainly, these newspapers had at least as much standing to sue as the petitioners in *Matter of Zorach* v. *Clauson* (303 N. Y. 161, affd. 343 U. S. 306).

2. *As to the court's power to exclude spectators in cases like this.* As I showed in my dissent in *People* v. *Jelke* (308 N. Y. 56, 68), it has been the undoubted law of New York at least since *People* v. *Hall* (51 App. Div. 57) was decided in 1900, that, in a case like this, the trial court has not only a discretionary power by custom to exclude, but that right, in such cases, has been expressly recognized by the exception in section 4 (*supra*). *People* v. *Hall* is directly in point, it has been everywhere cited and regarded as the New York law on the point, and I have not yet seen any ground or reason for refusing to follow it. Not only was the *Hall* case not overruled in *People* v. *Miller* (257 N. Y. 54), but the point was there carefully left undecided (see bottom p. 60 and top p. 61 of 257 N. Y.). Whether the statements, in *Hall,* that the section 4 exception applies to sex cases generally, is '' dictum '' is beside the point, since the *Hall* opinion states two separate bases for upholding the court's exclusion order there (exactly the same kind of order as here). Besides holding that the statute's excepting language authorized the barring order, the *Hall* opinion strongly asserted that the

presiding judge in every such trial has discretionary power to bar spectators (see pp. 61 to 63 of 51 App. Div.). While we are here differing as to the meaning of section 4, I have never heard any convincing reason why we should, by an ipse dixit, abolish the Trial Judge's traditional, necessary and salutary power to refuse to turn his courtroom into a peep show.

If I were a legislator, I might have other views as to the wisdom or good government of excluding newspaper reporters from any trial. But as a judge I must follow the law, and keeping salacious court proceedings out of the newspapers contravenes no one's legal rights (see *Danziger* v. *Hearst Corp.*, 304 N. Y. 244).

I vote to affirm.

FROESSEL, J. (dissenting). In *People* v. *Jelke* (308 N. Y. 56), decided herewith, we have just held that the broad order of exclusion made by Mr. Justice VALENTE, on his own motion and not at the request of the District Attorney or the defendant, deprived the latter of *his* right to a public trial. The order " directs that *the general public* and *the press* be excluded from the courtroom for the duration of the People's case " (emphasis supplied) and " that the Official Stenographer in these proceedings make copies of the minutes available to the defendant and to the District Attorney, if requested, but to no one else without the permission of the Court ". The basis of the ruling was: " Public decency compels it."

We are here called upon to determine whether the sweeping nature of this order and the ground upon which it was made are in contravention of law, and whether representatives of the press as members of the general public have an enforcible right, separate and apart from the right of the defendant, to require that the sitting of the court in this criminal case " shall be public ", and that they may " freely attend the same ". The basic facts are sufficiently stated in the companion criminal case. We agree with Judge FULD's opinion that the general doctrine forbidding review of abstract questions should not restrain us in this case; that no constitutional guarantees are involved; and that petitioners have no greater rights than " every [other] citizen ". However, we do not agree that plaintiffs are without status to bring this proceeding.

Section 4 of the Judiciary Law, so far as pertinent, provides as follows: " The sittings of every court within this state shall be *public, and every citizen may freely attend the same* [with exceptions not here relevant]." (Emphasis supplied.) In scope and meaning, this language, whether viewed in its own setting or in the light of its historical background, is clear and unmistakable, unambiguous and unclouded. It can only mean precisely what it plainly says, and may not be confused with section 8 of the Code of Criminal Procedure, nor section 12 of the Civil Rights Law. The latter statutes guarantee *to a defendant* in a criminal case a " public trial ". That is *his* right. Section 4 of the Judiciary Law, by an entirely different arrangement of words, grants a wholly separate and independent right, namely, a *public* right.

This right is subject, of course, to the enumerated exceptions created by the Legislature and contained in the statute itself, as well as those limitations sanctioned by common law and judicial decisions in carefully defined situations in the interest of the proper administration of justice, as appropriately outlined in the prevailing opinion in *People* v. *Jelke* (*supra*). None of those exceptions is relevant here, and we shall not advert to them again, save to emphasize that the statutory exceptions do not include this case. The dictum in *People* v. *Hall* (51 App. Div. 57), seemingly to the contrary, was not approved in *People* v. *Miller* (257 N. Y. 54) for there we held (p. 56) that a similar ruling of the trial court was " erroneous ". We deemed it harmless, however, pointing out that the defendant did not make timely protest, and stated specifically (pp. 60–61) that there was no occasion to consider whether the ruling as to him would be upheld if he had, thus indicating our unwillingness to follow *People* v. *Hall.* Inasmuch as representatives of the public and of the press were permitted to be present in *People* v. *Miller,* their exclusion was not in controversy. Moreover, the Legislature, despite the broad dictum in *People* v. *Hall,* deemed it necessary to amend the statute and thereby again expressly limited the exceptions only to the enumerated cases.

Said section 4 and the two guarantees to criminally accused defendants do not invite an *in pari materia* application, nor may they be fairly construed only as a single guarantee to defendants. Even though these statutes be read together, we

may not thereby disregard the unequivocal language of section 4, which expresses a clear intention to create a " public " right, nor may we restrict its plain meaning. Section 4 is not a mere restatement of the public trial guarantee contained in the other two statutes, nor does it simply extend the protection of a public trial to civil actions, i.e., to " sittings of every court ", but it expressly mandates that "every citizen may freely attend the same ". That may not be construed to mean that *no* representative of the public may freely attend. Yet, according to Judge FULD's opinion, a trial judge has the unrestrainable power to bar the public, including the press, from any trial or hearing where the parties thereto desire secrecy, or do not object.

The right of the public to attend a criminal trial, like the right of an accused defendant to a public trial, stems from the deep roots of the common law. There is a strong suggestion of this public right concept in Sir Edward Coke's analysis of the phrase " *In curia domini regis* ", as used in Statutum de Marleberge enacted in the year 1267, fifty-two years after Magna Charta (52 Hen. 3; 6 Halsbury's Statutes of England [2d ed]., pp. 135–138) : " These words are of great importance, for *all causes* ought to be heard, ordered, and determined before the judges of the kings courts *openly* in the kings courts, whither *all persons* may resort ". (Coke's Second Institutes, Vol. I, p. 103 [1797] ; emphasis supplied.) And in 1649, nearly four hundred years later, the guarded gates of the court were opened after John Lilburne's vigorous demand, at his trial for treason, in the course of which he said: " That by the laws of this land all courts of justice always ought to be free and open for *all* sorts of peaceable people to *see, behold and hear,* and have free access unto ". (4 How. St. Tr. 1270, 1273–1274; emphasis supplied.) While Lilburne spoke as an accused, the concept of the public's right to attend " to see, behold and hear " was rapidly growing, for this was but eight years after the Long Parliament abolished the Court of Star Chamber (*Matter of Oliver,* 333 U. S. 257, 266–267).

During that same decade, in 1641, the Colony at Massachusetts Bay enacted in the General Court " The Massachusetts Body of Liberties ", within which is found the following passage showing the " open court " principle then viewed as a public

right: "12. Every man whether Inhabitant or forreiner, free or not free shall have libertie to come to any publique Court, Councell, or Towne meeting". (Colonial Laws of Massachusetts [1889, reprinted from 1660 ed.], pp. 29–68, particularly 35.)

This public right concept has frequently been reasserted by text writers: Blackstone's Commentaries, Book 3, p. 373 (" in the presence of all mankind "); Hale, History of the Common Law of England, 6th ed. (1820), ch. XII, p. 343 (in the presence of " all by-standers "); Jenks, The Book of English Law (3d ed., 1932), p. 91 (" public have free access "); 2 Bishop's New Criminal Procedure (2d ed.), § 957 (" spectators are admitted "); 9 Halsbury's Laws of England, § 705 (" As a general rule all persons have a right to be present in court [with recognized exceptions] * * * it does not appear that a judge trying a criminal case has any power to exclude the public in general "); 1 Bentham, Rationale of Judicial Evidence, p. 524 (1827) (" Without publicity, all other checks are insufficient ").

Richard Burn, in his monumental work " The Justice of the Peace and Parish Officer " (17th ed. [1793], Vol. 4, p. 220), restates the same concept: " And *all* persons may freely attend at the sessions *for the advancement of public justice,* and for the service of the king " (emphasis supplied), an echo of John Lilburne's demand that all courts be free and open for " all sorts of peaceable people to see, behold and hear ". Indeed, Burn adds that " to this end ", namely, that " *all* persons may freely attend ", even persons subject to " common arrest " are exempt therefrom when attending on appropriate court business, citing Lambard, 402. This provision for exemption from " common arrest " is an additional right, and in no way cuts down the right of all persons to attend court sessions. There can be no doubt that these rights are entirely separate and distinct, for they were so recognized by the revisers in 1829, the right to exoneration from arrest provided for in chapter 19 of the Laws of 1684, having been by them limited to persons subpœnaed or ordered to attend (Rev. Stat. of N. Y. [1829], part III, ch. VII, tit. III, § 51; Vol. 2, p. 402) and continued to this date in section 25 of the Civil Rights Law; whereas the forerunner of section 4 of the Judiciary Law, as hereinafter noted,

was embodied in chapter III (tit. I, § 1) at page 274 of the same volume and part of said Revised Statutes.

Professor Wigmore noted some of the reasons for the maintenance of free public access to the courtroom — reasons apart from the protection of individual defendants in individual cases. The open proceeding, he states, serves to improve the quality of justice by improving the quality of testimony; under the " public gaze ", the officers of the court will be moved to a stricter " conscientiousness in the performance of duty "; persons not parties who may in some way be affected may have an opportunity of protecting themselves; the " educative effect of public attendance is a material advantage ", and, finally, " Not only is respect for the law increased and intelligent acquaintance acquired with the methods of government, but a strong confidence in judicial remedies is secured which could never be inspired by a system of secrecy." (6 Wigmore on Evidence [3d ed.], § 1834.)

The public right concept has also frequently been adverted to by the courts: " The inveterate rule is that justice shall be administered in open Court " (*Scott* v. *Scott,* [1913] A. C. 417, 445); " One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right " (*Maryland* v. *Baltimore Radio Show,* 338 U. S. 912, 920); " The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power " (*Matter of Oliver,* 333 U. S. 257, 270); " A trial is a public event. What transpires in the court room is public property. * * * There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it " (*Craig* v. *Harney,* 331 U. S. 367, 374); " In this country it is a first principle that the people have the right to know what is done in their courts " (*Matter of Shortridge,* 99 Cal. 526, 530); " The people are interested in knowing, and have the right to know, how their servants * * * conduct the public's business " (*State* v. *Keeler,* 52 Mont. 205, 218); " It is an undeniable proposition, to start with

in this discussion, that courts of justice should be open to the public " (*Williamson* v. *Lacy,* 86 Me. 80, 82).

In this State, as already noted, the requirement that every court sitting " shall be public ", and the right of every citizen freely to " attend the same " have been expressly provided for by section 4 of the Judiciary Law. This statute, without the exceptions added a half-century later, was enacted as part of the Revised Statutes in New York (Rev. Stat. of N. Y. [1829], part III, ch. III, tit. I, § 1; Vol. 2, p. 274). This was not new law, for the revisers then noted that this section was " Declaratory of the existing law " (3 Rev. Stat. of N. Y. [2d ed., 1836], Appendix, p. 694). In " Notes on the Revised Statutes of the State of New York ", published in 1830, and prepared by John C. Spencer, one of the three revisers, his simple and direct comment (p. 130) on this statute was: " All courts are to be open to the public." How can it reasonably be read otherwise?

We have pointed out that the reason why this statute was enacted was " in the public interest ". Thus, in *Lee* v. *Brooklyn Union Pub. Co.* (209 N. Y. 245, 248), Judge MILLER, speaking for our court, in discussing the rationale for allowing newspapers the privilege of reporting fairly what occurs in court trials, said: " The obvious reason is the *public interest in having proceedings of courts of justice public, not secret, for the greater security thus given for the proper administration of justice. For that reason* it was early provided by statute in this state that ' the sittings of every court within this state, shall be public, and every citizen may freely attend the same.' (1 R. S. part 3, chap. 3, § 1; see, also, Judiciary Law, § 4). The public generally may not attend the sittings of the courts, but they may be kept informed by the press of what goes on in the courts. * * * The proceeding was in open court where any citizen had the right to be." (Emphasis supplied.) And in *Matter of Rudd* v. *Hazard* (266 N. Y. 302), where a defendant had pleaded guilty before a Special County Judge after the adjournment of the regular term, we observed (p. 307): " Publicity, not secrecy, in arraignment, plea and judgment is part of our tradition. It is deemed necessary not only for individual security but also in the *public interest.* (Judiciary Law, § 4; *Lee* v. *Brooklyn Union Pub. Co.,* 209 N. Y. 245, 248.) " (Emphasis supplied.)

Clearly, then, the public possesses the right to attend trials in open court, and this right is twice bestowed, first by the heritage of the common law, and again by the express provisions of the Judiciary Law. It is said that defendant may waive his right to a public trial. It is true we have held, by Cardozo, Ch. J., in *People* v. *Miller* (*supra,* pp. 60–61), that where a defendant did not object to an order of the Trial Judge excluding visitors from the courtroom, justice did not require a new trial, even though we said the order was "erroneous". In that case, however, the Judge did not carry out his order, but admitted spectators and representatives of the press, excluding other visitors because of sanitary conditions in the crowded courtroom, and thus violated neither the defendant's right nor the public's right. We did not hold, nor have we ever held, that a defendant may waive the *public's* right to attend a court sitting.

Other situations referred to in Judge Fuld's opinion in which a defendant may waive a personal right are not relevant here. First, he has not waived; secondly, the rights referred to are *solely* defendant's rights, and, thirdly, in the case of a defendant's right to a jury trial, section 2 of article I of our State Constitution expressly authorizes a waiver. Moreover, in those situations, no separate parallel right is given to the public as in section 4 of the Judiciary Law.

We are also told that said section 4 may be invoked only by the accused in a criminal case, for whose security it has been "primarily" provided, that so long as a defendant is assured the right to invoke the public trial guarantee, "the public interest is safe and secure", and his defense is "more than likely" to be adequate. But suppose a defendant prefers a secret trial, and a court acquiesces, what happens to the public right? Are we to lay down a rule that in such a case section 4 of the Judiciary Law is suspended, and a defendant, whether because of his prominence or influence, his desire to shield the identity of witnesses, to conceal facts, to gain advantage, or for any reason contrary to the public interest, may preclude the public from attending his trial and observing the conduct of its servants and the administration of justice? The public right to attend the sittings of our courts is not safeguarded by a surrender of their right to a defendant.

If indeed there are in a given case valid reasons of exclusion embraced within the well-recognized exceptions and promoting the sound administration of justice, the trial court has appropriate power, regardless of the defendant's wishes or waiver. What we say here is that he does not have the power of *completely* excluding the public for the reason that public decency demands it. However well intentioned the Trial Judge was, and however much we may deplore sensationalism in the public press, our laws may not be disregarded. Only the Legislature may change them.

Since the public may attend court sittings, how may their right be enforced in the case of an invalid exclusion? Why may not representatives of the press as members of the public at large do precisely what they did here, and thus test the public right? They are neither meddlers nor outsiders, interfering with or injecting themselves into the conduct of a trial, nor do they seek to control the course of the proceedings. They seek to report what they are entitled to " see, behold and hear ". If they transgress beyond the pale of the law, they lose the privilege granted them under section 337 of the Civil Practice Act and are answerable for violation of the Penal Law (see arts. 106, 126).

Following the issuance of the completely exclusionary order by the trial court, petitioners moved with dispatch. They did not know whether Jelke would be acquitted or convicted; if the latter, whether he would appeal; in any event, even though he did appeal, he would be testing his own right, not the public's. We only dealt with *his* right in *People* v. *Jelke* (*supra*). The public right did not depend upon the happenstance that defendant might be convicted, and, if so, that he might appeal.

Petitioners therefore had the right as members of the public to challenge the ruling of the court. Subdivision 1 of section 1284 of the Civil Practice Act, defines a " body or officer " as including " every court ". Subdivision 4 of the same section refers to the relief available in a prohibition proceeding, namely, " to restrain a body or officer exercising judicial or quasi-judicial functions from proceeding without or in excess of jurisdiction ". Clearly, the Trial Judge proceeded, though with no ill purpose, in excess of his jurisdiction when he barred the entire public. Prohibition was petitioners' only remedy (*Matter*

*of Culver Contr. Corp.* v. *Humphrey,* 268 N. Y. 26; *Matter of Public Service Comm.* v. *Norton,* 304 N. Y. 522; *Matter of Hogan* v. *Court of Gen. Sessions,* 296 N. Y. 1; *People ex rel. Jerome* v. *Court of Gen. Sessions,* 185 N. Y. 504).

The fact that petitioners were not parties to the criminal action does not preclude them as members of the public from instituting this article 78 proceeding (*Matter of Public Service Comm.* v. *Norton, supra* [prohibition]; *Matter of Zorach* v. *Clauson,* 303 N. Y. 161, 168, affd. 343 U. S. 306, 309 [certiorari]; *Matter of Cash* v. *Bates,* 301 N. Y. 258, 261; *Matter of Andresen* v. *Rice,* 277 N. Y. 271, 281; *Matter of Kornbluth* v. *Rice,* 250 App. Div. 654, affd. 275 N. Y. 597; *Matter of McCabe* v. *Voorhis,* 243 N. Y. 401, 411; *People ex rel. Pumpyansky* v. *Keating,* 168 N. Y. 390; *Matter of Baird* v. *Board of Supervisors of Kings Co.,* 138 N. Y. 95, 115; *People ex rel. Daley* v. *Rice,* 129 N. Y. 449, 454; *People* v. *Halsey,* 37 N. Y. 344, 346–347 [mandamus]).

It is suggested that disorder and confusion would follow if we sustained the petitioners, and that we would be overwhelmed with collateral proceedings. This view is wholly unrealistic and without the slightest foundation. Petitioners promptly asked for a determination of the public right to attend court sittings nearly two years ago; once that determination is made, the confusion arising out of this controversy will disappear and the question now raised will be settled. Unless some member of the public is entitled to bring a proceeding such as this, how else could it be settled?

Accordingly, I recommend that the orders of the Appellate Division and Special Term be reversed; but, since the question presented by this appeal is now moot, and solely for that reason, the application of petitioners should be dismissed.

LEWIS, Ch. J., and CONWAY, J., concur with FULD, J.; DESMOND, J., concurs in result in a separate opinion; FROESSEL, J., dissents in an opinion in which DYE, J., concurs; VAN VOORHIS, J., taking no part.

Order affirmed.