THE PEOPLE v. THOMAS MURRAY.

*Criminal law—Public trial—Certiorari—Former jeopardy.*

1. An order by the court in a criminal case, directing an officer to stand at the door of the court-room, "and see that the room is not overcrowded, but that all respectable citizens be admitted and have an opportunity to get in when they shall apply," violates the right of the respondent to a public trial, guaranteed to him by section 28, art. 6, of the Constitution, and is also in violation of How. Stat. § 7244, which provides that "the sittings of every court within this State shall be public, and every citizen may freely attend the same."

2. A bill of exceptions would not show that the court-room was not overcrowded, and that most of the seats provided for spectators were vacant, and that many different persons, identifying them and showing them to be citizens of the State, had applied for admission and been refused, which facts are properly raised and brought before the Court by the writ of *certiorari* issued on affidavits stating such facts.

3. Where a conviction and judgment are set aside on proceedings instituted by the respondent on the ground that he has been deprived of a public trial, a plea of former jeopardy cannot avail to prevent a second trial.

Error and *certiorari* to recorder's court of Detroit. (Chambers, J.) Submitted on briefs November 12, 1891. Decided December 22, 1891.

Respondent was convicted of murder, and sentenced to State prison for life. Judgment reversed, and new trial ordered. The facts are stated in the opinion.

*Oscar M. Springer* and *W. Edgar Springer,* for respondent.

*A. A. Ellis,* Attorney General, *James V. D. Willcox,* Prosecuting Attorney, and *Allan H. Frazer,* Assistant Prosecuting Attorney, for the people.

CHAMPLIN, C. J. The respondent was convicted upon an information charging him with the murder of Edward Shoemaker, in the recorder's court for the city of Detroit, presided over by the Hon. F. H. Chambers, associate judge, and sentenced to be imprisoned in solitary confinement, at hard labor, for life, in the State prison at Jackson, and is now undergoing sentence. He sued out a writ of error, and also a writ of *certiorari.* No bill of exceptions was settled or signed, and the return thereto brings up merely the record of the case, to and including judgment, in which there appears to be no error. The writ of *certiorari* was based upon the petition of

Oscar M. Springer, the attorney for respondent, made and sworn to in his behalf, and sets forth that the respondent was not accorded a public trial; that the public were excluded from day to day from the court-room during the progress of defendant's trial, as appears by the affidavits of Charles Flowers, William May, John B. Stadler, Michael McKeogh, Henry S. Self, Joseph Boushey, William C. Nash, and Thomas M. Donnelly, filed with said petition and made a part thereof.

Thomas M. Donnelly's affidavit shows that he is an attorney at law; that during the progress of the trial of Thomas Murray, charged with the murder of Officer Shoemaker, he went to the recorder's court of the city of Detroit, where said case was on trial, and attempted to enter the court-room; that he was stopped in a peremptory manner by the officer at the door, who asked him this question, "Have you any business here?" to which deponent replied that "he had no particular business, except that he wanted to hear what was going on at the trial; that thereupon the officer said to him, "The judge doesn't want to see you;" and shoved him away from the door, and closed the door in his face; that he afterwards gained admission to the court-room through the clerk's office; that on entering the court-room he looked around, and saw how many persons were in the court-room, and according to his judgment there were not to exceed, outside of the officers of the court, the police commissioners, and policemen, a dozen persons in the court-room.

The affidavit of Charles Flowers shows that he is an attorney at law practicing in Detroit; that he was of counsel for David McCormick, who was charged, with Thomas Murray, with the killing of Officer Shoemaker, and was present at the greater part of the trial of said Murray, which continued about two weeks; that after the jury were sworn, and during the continuance of said

trial, the public were excluded from the court-room, an officer being placed at the door of the court-room, who refused admission to the general public; that he on several occasions interceded with the said officer, and sought to gain admission for the friends of deponent and others, known by deponent to be reputable and orderly citizens, and such permission was invariably refused, the said officer informing Flowers that he had been instructed by the court to admit no one who had not business in the court; that on each of such occasions he noticed that the court-room was comparatively empty, the only persons present being about a dozen policemen, three or four detectives, several police commissioners, and others apparently interested in the conviction of defendant; that on one occasion he protested against the secret trial which was going on, and asked the court to permit the public to enter; that the court replied that he did not propose to have the court-room crowded with people; that at the time this protest was made deponent counted the number of persons outside the bar of the court, and that there were five persons only present, and at the same time there were in the hall at least 20 persons, many of whom he knew to be reputable citizens, asking to be admitted; and he says that the seating capacity of the court-room is at least 200, and that at no time during the trial were there more than 20 persons in the court-room, outside of the officers and policemen before mentioned; that he can positively say that he saw at least 50 persons refused admission; that he was applied to by several citizens, and went with them to the officer at the door, and asked said officer to admit them; that they were friends of deponent, and had a right to witness the trial; and that on each occasion admission was peremptorily refused.

The affidavit of William May shows that he is a citi-

zen of the United States, and a resident of the city of Detroit, county of Wayne, State of Michigan; that he is a deputy-clerk in the office of the county clerk for the county of Wayne; that during the progress of the trial of Thomas Murray, charged with the murder of Officer Shoemaker, he endeavored to secure admittance to the recorder's court, where said Thomas Murray was on trial on the charge aforesaid, but was stopped at the door by a policeman; that he had considerable difficulty in gaining admission to said court; that he met in the corridor leading to the court-room two jurymen of the Wayne circuit court, who stated that they were desirous of attending said trial, and had been refused admission to said court-room; that before they could get into said court he had to obtain permission of the judge, although the benches in the court-room provided for the public were practically vacant; that the officer at the door of said court informed him that the general public were not allowed admission to the court; that he saw a number of persons standing around the corridor leading to the court who had apparently been denied admission.

John B. Stadler in his affidavit says that he is a resident of the city of Detroit; that he attended the trial of Thomas Murray, charged with the killing of Officer Shoemaker; that he had difficulty in getting into the court-room, and would not have been admitted had it not been for the intervention of the prosecuting attorney; that during the trial, which lasted for nearly two weeks, he knows that the public generally were excluded from the court-room; that he has seen a number of persons from day to day trying to gain admission to the court-room, and who were not admitted by the officer, although there was plenty of seating capacity in the court-room for spectators and the public; that on one occasion he remembers having seen persons trying to gain admission,

and they were refused by the officer at the door, and he knows that there were not to exceed five or six persons sitting on the benches provided for the public; that he has seen the hall leading to the court full of people who were excluded from the court-room, although the benches provided for the public inside were practically vacant.

Michael McKeogh's affidavit shows that he is a citizen of the United States, and a resident of the city of Detroit; that he attempted to gain admission to the court-room for the purpose of witnessing and hearing the trial; that he was stopped in a peremptory manner by a police officer stationed at the door, and informed that he could not go in; that he had an opportunity of seeing into the court-room, and can positively say that the benches provided for the public were practically vacant.

Henry S. Self says that during the progress of the trial he made application on two different occasions for admission to the court, on both of which there was an officer stationed at the door of the court-room where Murray was on trial, and he was refused admission by the officer at the door; that on both occasions he saw a number of persons trying to gain admission, who were refused in a peremptory manner by the officer at the door, notwithstanding the fact that the benches in the court-room provided for the public were practically vacant.

Joseph Boushey swears that he is a resident of the city of Detroit, and a citizen of the United States, and has lived in the city of Detroit for a number of years; that on the 22d and 23d of April, during the trial of Thomas Murray, he applied for admission to the court, and was peremptorily refused, although there were very few people in the court-room; that on the 22d day of April he stood around the corridor leading to the court-room from 9 o'clock in the morning until 12 at noon,

and that during that time he saw at least 50 persons try to gain admission, who were refused admission to said court-room; that he is able to say positively that there were not on that day to exceed a half dozen persons sitting on the benches of said court-room on the north side thereof; and again, on the 23d of April, he was in the corridor leading to said court-room, and saw at least 50 persons who were peremptorily refused admission by the police officer stationed at the door, there being not to exceed a half dozen persons sitting upon the benches in the court-room.

W. C. Nash swears that he is a resident of the city of Detroit, and that he made application for admission to the court-room during the progress of the trial of Thomas Murray, charged with the murder of Officer Shoemaker; that he was peremptorily refused admission by the police officer stationed at the door of said court; that he had an opportunity to see into the court-room, and knows that the benches on the north side of said court-room provided for the public were practically vacant; and that at the time he made application for admission to said court he saw a number of persons in the corridor leading to said court who apparently desired to get in, but were not permitted to do so by the officer at the door.

To the writ of *certiorari* the presiding judge returns as follows:

"I hereby certify and return that the following statement of what occurred is a true and correct statement of all that occurred, within my knowledge, during the said trial, while court was in regular session, in reference to the exclusion of the public from the court-room, as appears from the stenographic minutes:

"*'Mr. Springer:* My attention has been called to the fact that a large number of respectable citizens and tax-payers have been excluded from the court-room by the officer, who does not seem to be able to exercise any discretion whatever in that respect, and

the talk around town is that this trial is a sort of a star-chamber proceeding.

" '*The Court:* You don't think so?

" '*Mr. Springer:* I don't know, your honor. I don't know who has been excluded or who has not, but, for the sake of saving the point, I desire an exception to be entered on the record.

" '*The Court:* I cannot give you an exception to that. That is not in the order of trial. That is not the way to get it. There is nothing before the court on that subject. I want to say this: The orders to the officer were that he should stand at the door, and see that the room is not overcrowded, but that all respectable citizens be admitted and have an opportunity to get in when they shall apply.

" '*Mr. Springer:* If your honor please, I understand—

" '*The Court:* If you can make any capital out of that, you can make it.

" '*Mr. Springer:* I am not trying to make any capital out of it.

" '*The Court:* It looks like it.

" '*Mr. Springer:* In order to determine whether or not these things have been done, I think it would be well to call the officer to the stand to testify to what he has done.

" '*The Court:* You propose to stop the trial now, and introduce extraneous matter. I do not propose to.

" '*Mr. Springer:* Your honor, then I will take an exception to that.

" '*The Court:* The officer has got his orders, and they are in accordance with the law, as I take it, and, if you have any objection, you will have to take it in some other way than by exception. Proceed with the trial.'

"And I hereby further certify and return that no order was ever made by me at or during the said trial excluding any person or persons from the court-room during the said trial; that the said trial was at all times during the same a public trial, within the meaning of the Constitution; that the said court was every morning, while the same was had, regularly opened by an officer thereof, duly authorized, and declared open for the hearing and trial of causes, and there were several places of ingress and egress accessible to persons wishing to visit the said court at all times, and there were always present during said trial several persons, and at most times a very large assembly of persons, apparently listening to the trial."

We cannot accept the conclusion of the judge, "that

the said trial was at all times during the same a public trial, within the meaning of the Constitution." The first clause of section 28 of article 6 of the Constitution reads as follows:

"In every criminal prosecution, the accused shall have the right to a speedy and public trial by an impartial jury."

The right to a public trial is one of the most important safeguards in the prosecution of persons accused of crime. In this case, when the accused is upon trial for a crime for which, if convicted, his punishment is that he must suffer a life imprisonment,—a civil death,—an order is made by the court which violates the constitutional right of the accused, and the statute enacted to protect the rights of parties in both civil and criminal cases. The right of the accused to a public trial is included in the same section of the Constitution with the right to a trial by an impartial jury of 12 men; to be informed of the nature of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense. It is not necessary to review the history of the administration of the criminal law in England, or to call attention to the abuses in its administration, to show the reason why these important provisions were inserted in our Constitution, which, in this respect, is but a reflection of similar provisions contained in all of the constitutions of the American states and of the United States. They are each and all enacted for the protection of rights of persons accused of criminal offenses, and each is a constant memorial of the great abuses practiced in England at one time and another prior to the American Revolution, in conducting criminal prosecutions. In *Hill v. People*, 16 Mich. 351, it was held that the accused person could

not waive his constitutional right to a trial by a jury of 12 men, guaranteed to him under this section of the Constitution, and it was said by the Court that—

" It is the duty of courts to see that the constitutional rights of a defendant in a criminal case shall not be violated."

In this case it is apparent that the constitutional rights of Murray were violated in the order of the court to the police officer stationed at the door of the court-room—

" That he should stand at the door, and see that the room is not overcrowded, but that all respectable citizens be admitted and have an opportunity to get in when they shall apply."

It is shown beyond question that during the whole trial the court-room was not overcrowded, nor were the seats provided for spectators occupied to any great extent. This officer was under the control of the court, and when the court was informed that he was excluding citizens and tax-payers he refused to take any notice of the complaint, and left the officer to exercise his discretion as to what respectable citizens he should admit. Is respectability of the citizen who desires to witness a trial to be made a test of the right of access to a public trial, and is that test to be left to the knowledge or discretion of a police officer? Must a citizen who wishes to witness the trial of a person accused, whether he be a friend, an acquaintance, or a stranger to the accused, present to the police officer stationed at the door of the Temple of Justice a certificate of his respectability? If so, by whom shall it be certified? By the mayor, the chief of police, or police commissioners, or by his pastor or clergyman? Neither the Constitution nor the law requires any such preposterous condition to the admission of a citizen to attend and witness a trial, either civil or criminal.

The order of the court stationing the policeman at the door, with directions to admit none but respectable citizens, was not only a violation of the Constitution, but it was a direct violation of the public statutes of this State. Section 7244 of Howell's Statutes enacts.

"The sittings of every court within this State shall be public, and every citizen may freely attend the same."

This statute has been in force since 1846. It voices the sentiment of the people at the time the Constitution of 1850 was adopted. It gives expression to what is there meant by a public trial. Courts have no dispensing power when the Legislature has spoken. The judge who presided at the trial of this case was as much bound by this provision of law as the humblest citizen. The trial may have been an impartial one; the respondent may have been justly convicted; but it still remains that it was accomplished in violation of his constitutional and statutory right to a public trial. Edmund Burke never expressed a more important truth than when, speaking respecting the suspension of *habeas corpus* at the time of the American Revolution, he said: "It is the obnoxious and suspected who want the protection of the law." Courts of final resort cannot consider the question whether the respondent was justly convicted or not in passing upon questions of law presented for their consideration. It is for the protection of all persons accused of crime—the innocently accused, that they may not become the victim of an unjust prosecution, as well as the guilty, that they may be awarded a fair trial—that one rule must be observed and applied to all.

Since the case was submitted we have been furnished with a brief by Allan H. Frazer, in behalf of the people, who is the prosecuting attorney who secured the conviction of Murray. The position taken by the learned prosecutor in support of the conviction of Murray is—

1. That the fact that Murray was not awarded a public trial cannot be raised or adjudicated upon *certiorari*.

2. That he did have a public trial, within the meaning of section 28, art. 6, of the Constitution.

We do not think that the errors brought up by the writ of *certiorari* could have been reached by a writ of error. Many facts which are shown in the affidavits and petition for the writ would not appear in the return to a writ of error or in a bill of exceptions. The bill of exceptions only brings up such facts as appear in the course of the trial in the presence of the court. And during the trial in this case the court plainly told the counsel for the accused that he could not raise the question in the way in which he was seeking to do it, and charged him with an effort to make capital out of his objections. The bill of exceptions would not have shown that the court-room was not crowded; that most of the seats provided for spectators were vacant; that many different persons, and the particular persons showing themselves to be citizens of the State, had applied for admission, and had been refused; none of these things could have appeared in the bill of exceptions. We think that they were properly raised and brought before the Court by the writ of *certiorari*.

Three authorities are cited in support of the action of the judge. One is the case of *State v. Brooks*, 92 Mo. 573. In that case, in the opinion handed down by the supreme court, it was said that an objection was taken that the defendant did not have a public trial, and the court said:

"This claim is based upon the fact that during the early stages of impaneling the jury two men were stationed, on the afternoon of one day and the forenoon of the next day, at the door of the court-room, who refused to admit any one into the court-room except jurors, witnesses, or officers of the court, or those having business in

court. It appears that, when this matter was brought to the attention of the court, the court stated that no order had been made stationing men at said door, and announced that any one who wished to come. into the court-room could do so, and made an order that all persons be admitted until all the seats were filled. Had the court either refused to make such an order, or if, after making it, had refused a request on the part of the defendant that the jurors who had been examined touching their qualifications while the men were stationed at the door should be re-examined, this might have afforded some ground for the complaint made; but no such a request was made."

This is not in any respect a parallel case to the one under consideration. In the Brooks case the exclusion of the public only continued through the afternoon of one day and the forenoon of the next. In Murray's case it lasted during the entire trial of two weeks. In the Brooks case, when the matter was called to the attention of the court, the court stated that no order had been made stationing men at the door, and announced that any one who wished to come into the court-room could do so, and made an order that all persons be admitted until the seats were filled. In Murray's case the court made the order stationing the policeman at the door to see that all respectable citizens be admitted. His attention was called to the fact that respectable citizens and tax-payers were refused admission, and, instead of making an order that all citizens be admitted until the room was filled, he said that—

"The officer has got his orders, and they are in accordance with the law, as I take it, and, if you have any objection, you will have to take it in some other way than by exception. Proceed with the trial."

The judge's position in Murray's case finds no support whatever in the Brooks case.

We are also cited to the case of *People v. Kerrigan,* 73 Cal. 223 (14 Pac. Rep. 849). In that case the defend-

ant was convicted of an assault with intent to commit murder. The defenses interposed at the trial were "not guilty and insanity." During the progress of the trial in the court below the defendant became greatly excited, and indulged in profane and abusive language, addressed to the judge and other officers of the court. Her conduct created so much commotion among the spectators that the trial was seriously interrupted, and the court found it necessary to make an order excluding spectators from the court-room. In deciding the case the court said:

"Appellant claims that she was deprived of the constitutional right of a public trial, by the making and enforcement of this order. There is some controversy as to the scope of the order,—which was not entered in the minutes at the time,—but the judge certifies that the order was 'that the lobby outside of the court-room should be cleared of spectators, as their presence tended to irritate and excite the defendant, and that no persons except officers of the court, reporters of the public press, friends of the defendant, and persons necessary for her to have on said trial should be allowed to remain.' It appears, further, from the statement of the judge, that no order was made requiring the doors to be closed, and that in fact the friends of defendant and reporters were permitted to come and go at will; that the order was made by the court on behalf of the defendant, as well as to preserve order, because the attendance and conduct of a large crowd of spectators in the court-room evidently tended to excite the defendant; and it is apparent from the affidavits, showing the conduct of the defendant and many of the spectators, that such was the fact. In our opinion, the order and action of the court, as shown by the bill of exceptions, were not in violation of the defendant's right to a public trial. It was proper, we think, under the circumstances, to exclude from the court-room those who were excluded, not only because of the vulgar and profane language of the defendant herself, but because such action was evidently necessary to protect the court from indignity and inde-

corum. No actual injury to the defendant is shown. It is not shown that any person who could have been of any service to the defendant on her trial was excluded. While it is very important that all the rights guaranteed by the constitution to a person charged with crime should be fully and fairly awarded to him, it is also important that courts of justice should be upheld in the enforcement of all necessary and reasonable rules for the orderly, speedy, and effective conduct of their duties."

Neither is this case an authority for what was done in Murray's case. The court did not order the court-room to be cleared of spectators, but the lobby outside. There is nothing in the facts of that case which assimilate in any degree to the trial of Murray. Here no violence is shown, no disorderly conduct, no violent or disgraceful action on the part of Murray, which tended to lessen the dignity of the court, or bring the administration of justice into disrepute.

I cannot accede to the correctness of the proposition intimated in that case that, if a public trial has not been accorded to the accused, the burden is upon him to show that actual injury has been suffered by a deprivation of his constitutional right. On the contrary, when he shows that his constitutional right has been violated, the law conclusively presumes that he has suffered an actual injury. I go further, and say that the whole body politic suffers an actual injury when a constitutional safeguard erected to protect the rights of citizens has been violated in the person of the humblest or meanest citizen of the State. The Constitution does not stop to inquire of what the person has been accused or what crime he has perpetrated; but it accords to all, without question, a fair, impartial, and public trial. There is no such limitation in the Constitution nor in our statute above quoted, from which it can be inferred that—

"The requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether."

Who is to decide who are the friends of the accused? The law makes no such test, but allows all citizens freely to attend upon any trial, whether civil or criminal. Instances have been referred to by Judge Cooley in his work upon Constitutional Limitations, 5th ed., at page 380 (star page 312), where, under certain circumstances, it might be proper to exclude a certain portion of the community from attending trials which would tend to degrade public morals, or would shock public decency, in which he says that at least the young should be excluded. There can be no objection to this, so long as citizens of the State who have arrived at the years of discretion and manhood are permitted to enter freely. The learned commentator lays it down that—

"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with, and not unjustly condemned, and that the presence of interested spectators may keep his triors keenly alive to a sense of their responsibility and to the importance of their functions."

It is also urged that in this case the prisoner was accorded a public trial, for the reason that there were several other ways of obtaining ingress to the court-room than that in which the public generally entered. The learned judge returns to the writ of *certiorari* that "there were several places of ingress and egress accessible to persons wishing to visit the said court at all times." But this is a mere subterfuge. There was a public entrance, at which the public applied for admission and were refused. As is shown by the affidavits, or one of them,

one of the persons, knowing of the private entrance through the clerk's office, entered in that manner, after being refused admission at the public entrance. It is not usual for the public to pass through these private entrances into the court-room, and it is no answer for the court to say that, although he stationed a policeman at the door of the public entrance, there were other ways of ingress to persons who wished to gain admission. We have no hesitation in saying that the prisoner was denied the right of a public trial, and the proceedings in consequence must be declared a mistrial, and his conviction must be set aside, and a new trial must be had.

We are asked to discharge the prisoner, on the ground that he has been once in jeopardy, and cannot, therefore, be tried again. The question is a serious one, and we have considered it with care. The judgment and conviction are set aside in this case on a proceeding instituted by the prisoner, and is to be treated as if the judgment had been arrested on his own motion, and the judgment and verdict set aside. In such cases the plea of former jeopardy cannot avail. *State v. Hays,* 2 Lea, 156; *State v. Walters,* 16 La. Ann. 400; *State v. Redman,* 17 Iowa, 329; *People v. Casborus,* 13 Johns. 351; *State v. Norvell,* 2 Yerg. 24; *Com. v. Hatton,* 3 Grat. 623; *State v. Clark,* 69 Iowa, 196; *Gerard v. People,* 3 Scam. 362; *People v. Barric,* 49 Cal. 342; *People v. Olwell,* 28 Id. 456; *Morrisette v. State,* 77 Ala. 71; *People v. Helbing,* 61 Cal. 620; *Johnson v. State,* 29 Ark. 31; *People v. White,* 68 Mich. 648; *People v. Price,* 74 Id. 37, 44; 1 Bish. Crim. Law, §§ 1004, 1016.

In *Hill v. People,* 16 Mich. 351, one of the jury who convicted the prisoner was an alien, and therefore disqualified, and it was held that his conviction was a violation of section 28, art. 6, of the Constitution. The respondent in that case moved for a new trial upon that

ground. This Court in reversing the judgment ordered a new trial.

The judgment must be reversed, the prisoner must be remanded to the custody of the sheriff for the county of Wayne, and a new trial is ordered.

MORSE, McGRATH, and LONG, JJ., concurred with CHAMPLIN, C. J.

GRANT, J. I concur with my Brother CHAMPLIN in his opinion that the respondent was not accorded a public trial within the meaning of the Constitution and the laws of this State, but I cannot concur with him in holding that the writ of *certiorari* was the proper way to bring the case to this Court. I think the writ was improvidently issued.

The respondent offered testimony tending to show that persons had been excluded from the court-room during the trial by an officer in charge of the principal entrance to the court-room. The court refused to admit it. Respondent's counsel excepted. He should have settled a bill of exceptions, and brought the case to this Court by a writ of error. It is no answer to this to say that the trial court refused an exception. This no court could prevent. Counsel announced his exception, which was minuted by the stenographer, as shown by the return. No order was made by the court and entered upon the minutes. The judge had given instructions to the officer not to permit the court-room to be overcrowded. This instruction was proper, but he had no right to commit to the officer the determination as to who were respectable citizens to be admitted. It is apparent that the court could make no return to many of the statements made in the affidavits, for the facts they stated did not occur in his presence. The exclusion of citizens was a fact to

be proven, like any other fact, and the truth should be elicited by examination and cross-examination. It does not seem to me to be the proper practice that so important a question should be determined in the court of last resort upon *ex parte* affidavits which contain many hearsay statements. To illustrate, several of the affiants say that the benches were practically vacant, without giving any statement or opinion as to how many were there. What is meant by "practically vacant?" How many, in the opinion of this witness, or how few, should be present in order to constitute such practical vacancy? Counsel for respondent recognized this as the proper practice, in raising the point upon the trial, for, in a reply to a question by the court, he said:

"I don't know who has been excluded or who has not, but, for the sake of saving the point, I desire an exception to be entered on the record."

Respondent was convicted May 3, 1890. August 28, 1890, he presented to one of the Justices of this Court a petition for a writ of *certiorari*, which was allowed, and no steps appear to have been taken to bring the case to a hearing in this Court until the October term, 1891. The record contains less than 10 pages. All the facts were known to the respondent and his counsel at the trial. All the papers could have been prepared in a few hours. The case could, and should, if presented at all, have been presented to this Court at the June term, 1890. Instead, however, the case rests for three and one-half months, until the time to settle a bill of exceptions has expired, and then, after obtaining an allowance of the writ, rests for 13 months longer. Meanwhile it is probable that the people's testimony is scattered and lost. Such delays, if attributable to the respondent, do not comport with innocence, especially when he is in

prison serving out his sentence. These delays cannot be too severely condemned. They are, in my judgment, a disgrace to the administration of the criminal law. For these reasons I think the writ should be dismissed.