OPINION OF THE COURT
Fuchsberg, J.
This appeal centers on the constitutional guarantee that an "accused shall enjoy the right to a * * * public trial” (US Const, 6th & 14th Arndts; see, also, Civil Rights Law, § 12; Judiciary Law, § 4).[1]
Specifically, the issues presented for our determination are *412 (1) whether the defendant’s right to a public trial was abridged when the Trial Judge without further inquiry acceded to the prosecuting attorney’s request that the court be closed to the public during the testimony of a witness alleged to be an undercover police officer and (2), if it was, whether the defendant’s conviction is reversible on that ground in the absence of a showing of prejudice.
Defendant was convicted of charges arising out of the sale of heroin to two undercover police officers, Brown and Howard, who were the primary witnesses at his trial. Of the two, Howard was the first to take the stand. Midst his testimony, the Trial Judge turned to the prosecutor and, sua sponte, asked whether the courtroom should be closed to the public "because you have an undercover”. The Assistant District Attorney first responded that he had anticipated rejection of such an application because it would "den[y] the defendant’s right to a public trial”, but then went on to assert that Howard was frightened and desired the courtroom closed to spectators. However, before there was a ruling on defense counsel’s objection, Howard, though then still assigned to undercover activity, disclaimed any apprehension about testifying in open court, whereupon the issue was dropped.
Next day, as Brown was about to be called, the prosecutor, now needing no prompting, again applied for closure on his representation that the witness "is in fear of his life”. Over defendant’s protest that no hearing to establish a compelling need for that step had been held, the Judge, without requesting or receiving an iota of supporting information either by way of testimony or colloquy, granted the application summarily. In doing so, he merely announced that he was taking "judicial notice” that "the very nature of the work of the undercover agent in the City of New York involved with narcotics is such as to place him in jeopardy every day he is on the streets because of the high crime incidence in the areas the undercover has worked and, as a matter of fact, where *413 this case arises from. The court is satisfied that there is a real and present danger to his safety”.
The courtroom having been cleared, it was not long before a picture completely at odds with the one portrayed by the prosecutor was unveiled. For Brown himself testified that he no longer was engaged in undercover activity, that indeed he had already been serving in his new assignment as a uniformed patrolman for the last six months, and that his beat was distant from his former theatre of operations. Specifically, he made clear that he was not involved in any ongoing narcotics investigations, whether by way of carry-over from his previous work or otherwise. Even then, the court did not rescind its order.
On its review of the judgment of conviction, the Appellate Division (over Justice Sandler’s dissent) concluded that this episode had not "seriously deprived defendant of the benefit of a public trial”. For the reasons which follow, our view is to the contrary.
At the outset, we observe that the public trial right, the foundations of which are too well catalogued elsewhere to require recapitulation here (see People v Jelke, 308 NY 56, 61-64; Matter of Oliver, 333 US 257, 266-271; Radin, Right to a Public Trial, 6 Temple LQ 381), is neither absolute nor inflexible. But we also note that, though this leaves courts with some leeway in its enforcement, since the concept of a secret trial is anathema to the social and political philosophy which motivates our society, the discretion to limit the public nature of judicial proceedings is to be "sparingly exercised and then, only when unusual circumstances necessitate it” (People v Hinton, 31 NY2d 71, 76).
This caution recognizes that the fundamental and constitutional nature of the right does not permit the making of an uncharted, ungrounded or unjustified exception. Rather, common sense and the more specific principles articulated in prior decisions serve as guides in balancing the defendant’s paramount rights, the need to preserve order in the courtroom while disposing of cases expeditiously, and the likelihood that any particular measure adopted will significantly foster full and truthful testimony (see, generally, Bowers, Judicial Discretion of Trial Courts, § 262, pp 296-297; United States ex rel. Bruno v Herold, 408 F2d 125; People v Byrnes, 84 Cal App 2d 72, cert den 335 US 847).
These considerations in mind, we address the more *414 immediate question — the practical operation of the guarantee in circumstances where those engaged in undercover work on behalf of law enforcement authorities are called upon to give evidence. In this connection, our decision in People v Hinton (31 NY2d 71, supra) left no doubt that trials in our State may be closed during the testimony of agents whose public appearance would endanger their lives or seriously damage other investigations. However, we never suggested that, absent real jeopardy, such an agent’s appearance on the stand, without more, would sanction an exclusion order. Nor did we there have occasion to consider the methodology by which a court was to go about the business of determining whether the facts underlying the application fell within the standards enunciated in the cases.
However, a trial court would not appear to be without discretion to choose among alternative means for determining whether an application to close a courtroom is meritorious (cf. People v Jelke, 308 NY 56, 63, supra).
For instance, there are times when careful inquiry directed at counsel, the witness, or even the spectators present in the courtroom might be enough (see United States ex rel. Smallwood v La Valle, 377 F Supp 1148, 1153). Had the Judge here employed this technique prior to closing, he presumably would have ascertained that the prosecutor had not questioned Brown on the subject for a long time and that the information contained in the District Attorney’s file on this score was stale. No doubt, this would have led him to discover that Brown was no longer engaged in narcotics assignments but was now serving in a capacity in which he literally paraded his identity as a policeman. Though the termination of his undercover work would not necessarily have precluded the court from granting the request to close, it should have made the Judge realize all the more that the prosecutor had to establish that the danger to the witness was still present.
In other cases, the only trustworthy means of establishing grounds for excluding the public may very well be to hold an evidentiary hearing (see United States ex rel. Lloyd v Vincent, 520 F2d 1272, 1275), which, if the need is apparent, might be held behind closed doors (cf. People v Goggins, 34 NY2d 163). In short, while there is no single rule to cover every case, no closing can be tolerated that is not preceded by an inquiry careful enough to assure the court that the defendant’s right *415 to a public trial is not being sacrificed for less than compelling reasons.
As indicated, in the present case, the course adopted by the trial court in response to the all but invited conclusory motion of the prosecutor was not reasonably directed to the ascertainment of whether public testimony by Brown would threaten his safety or the integrity of any other case. There should have been a factual showing that an exception to the norm of a public trial was justified (see People v Castro, 63 AD2d 891; People v Boyd, 59 AD2d 558). Instead, the court was content to rely on its own unparticularized impressions of the vicissitudes of undercover narcotics work in general. That undercover work at times entails serious threats to the safety of agents was by no means sufficient to connect that threat to this witness. And, the court apparently treated the issue with so little appreciation of its place in the hierarchy of constitutional rights that, even when it became apparent, as it did practically at the beginning of Brown’s testimony, that the information upon which the Judge had acted had been totally misleading, the closure was permitted to continue until sometime after the witness had departed.
Our conclusion that defendant’s trial was improvidently closed to the public brings us to the question whether such error is reversible. In contending that it is not, the People rely on the harmless error rule. And it is true that defendant points neither to discrepancies in the testimony of Officer Brown vis-á-vis that of Howard, nor to any exculpatory evidence or other benefit that might have come to him had the entire trial been public. But, in our view, prejudice need not be demonstrated.
This was recognized in People v Jelke (308 NY 56, 67-68, supra), where Judge (later Chief Judge) Fuld wrote, "To the plaint that such a ruling will result in reversal of a conviction of one clearly proved guilty, it is sufficient to say that the decision herein far transcends the issue of [defendant’s] guilt or the disposition of this particular case. As one court has expressed it (People v. Murray, supra, 89 Mich. 276, 286), Tt is for the protection of all persons accused of crime — the innocently accused, that they may not become the victim of an unjust prosecution, as well as the guilty, that they may be awarded a fair trial.’ ”
The continued viability of this pronouncement appeared for a time to have been undermined by People v Hagan (24 *416 NY2d 395, 400), in which, though only as an alternative ratio decidendi, the court held that "[e]ven if there were error in the exclusion [of the public from defendant’s trial], it should be held beyond a reasonable doubt that it was harmless (Chapman v. California, 386 U. S. 18).” On the other hand, resuscitation came when we adopted the Chapman harmless constitutional error rule in People v Crimmins (36 NY2d 230). There, while not expressly treating with public trial, we left no doubt that the right to a fair trial was impervious to harmless error analysis (36 NY2d, at pp 237-238; see, also, People v Williams, 46 NY2d 1070; People v Savvides, 1 NY2d 554).
Public trial and fair trial are not strangers. Hindering concealment of abuses of the judicial process is a significant safeguard against unfair trials. Chief Justice Earl Warren regarded the open courtroom a part of " 'the fundamental conception’ of a fair trial” (Estes v Texas, 381 US 532, 560) and Justice John M. Harlan spoke of it as the "institutional safeguard for attaining [a fair trial]” (Estes v Texas, supra, at p 588).
Moreover, as suggested by the foregoing comments, though the Sixth Amendment speaks of the right as that of the "accused”, it is well recognized that the public at large has an overriding concern with the values thus fostered (see, e.g., Matter of Oliver v Postel, 30 NY2d 171; Nebraska Press Assn. v Stuart, 427 US 539; Judiciary Law, § 4; Comment, The Right to Attend Criminal Hearings, 78 Col L Rev 1308, 1310-1311).[2] For example, public confidence in the administration of justice is enhanced when its doors are open to all, litigants and nonlitigants alike, and wide understanding of its methods moves in the same direction (6 Wigmore, Evidence [Chadbourn rev, 1976], § 1834; Note, 41 NYU L Rev 1138, 1139). The harmless error rule is no way to gauge the great, though intangible, societal loss that flows from the frustration of such a goal.
The practical impossibility of demonstrating prejudice faces *417 an accused as well. Conceptually, a member of the public witnessing a trial may discover that he possesses material information which he will then volunteer to the parties. Or, the presence of the public may have a salutary influence in deterring a witness from perjuring himself in ways that would have been difficult for the defense to counteract. To require the defendant to undertake the well-nigh impossible task of proving prejudice would render the right to a public trial illusory and beyond appellate review on that basis (State v Schmit, 273 Minn 78; Davis v United States, 247 F 394; State v Haskins, 38 NJ Super 250; see, generally, Note, 41 NYU L Rev 1138, 1149; Note, 20 Stanford L Rev 83, 89; cf. People v Felder, 47 NY2d 287).
As a consequence, some courts have found it more comfortable to simply say that a violation of such a fundamental right implies prejudice (People v Byrnes, 84 Cal App 2d 72; Tanksley v United States, 145 F2d 58; State v Keller, 52 Mont 205; see, also, United States ex rel. Bennett v Rundle, 419 F2d 599; United States v Kobli, 172 F2d 919).
For all these reasons, we today make explicit what in Crimmins was implicit and reaffirm the holding in Jelke that a per se rule of reversal irrespective of prejudice is the only realistic means to implement this important constitutional guarantee. Therefore, the order appealed from should be reversed and a new trial ordered.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Wachtler concur with Judge Fuchsberg.
Order reversed, etc.

. Although the Sixth Amendment is applicable in State trials by virtue of the due process clause of the Constitution (Duncan v Louisiana, 391 US 145; Estes v Texas, 381 US 532; Matter of Oliver, 333 US 257), most State Constitutions contain identical guarantees (see Note, 41 NYU L Rev 1138, 1140, nn 11-15). New York is among a small minority of States with no specific constitutional provision, but this oversight is compensated by the forthright language of section 12 of the Civil Rights Law ("In all criminal prosecutions, the accused has a right to a * * * public trial”) and section 4 *412 of the Judiciary Law ("The sittings of every court within this state shall be public, and every citizen may freely attend the same, except that in all proceedings and trial in cases for divorce, seduction, abortion, rape, assault with intent to commit rape, sodomy, bastardy or filiation, the court may, in its discretion, exclude therefrom all persons who are not directly interested therein, excepting jurors, witnesses, and officers of the court”). The exceptions listed in the Judiciary Law were narrowly limited in People v Jelke (308 NY 56) and would not, in any event, supersede a defendant’s constitutional rights.

. The right to a public trial is a protagonist in the fair trial/free press controversy, where it is asserted in opposition to the defendant’s claim of prejudice from publicity (see Matter of Gannett Co. v De Pasquale, 43 NY2d 370, affd 443 US — [July 2, 1979]; Matter of United Press Assns. v Valente, 308 NY 71, see, generally, Dorsen, Bender & Neuborne, Political and Civil Rights in the United States [4th ed], pp 493-512; ABA Advisory Committee on Fair Trial and Free Press, Standards Relating to Fair Trial and Free Press [TD, 1966]).