**Raymond CAMPBELL, Petitioner,**

v.

**John SABOURIN, Superintendent of Chateaugay Correctional Facility, and Dennis Vacco, New York State Attorney General, Respondent.**

**No. Civ.A. 97–1796(DGT).**

United States District Court,
E.D. New York.

March 29, 1999.

Elizabeth Sack Felber, The Legal Aid Society, Criminal Appeals Bureau, New York City, for petitioner.

Hon. Richard A. Brown, Queens County District Attorney, by Robin A. Forshaw, Kew Gardens, New York, for respondents.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Following a jury trial in New York Supreme Court, County of Queens, petitioner was convicted of criminal sale of a controlled substance in the third degree. On May 9, 1994, the Appellate Division, Second Department, unanimously affirmed petitioner's judgment of conviction. *People v. Campbell*, 204 A.D.2d 474, 614 N.Y.S.2d 170 (2d Dept.1994). On June 29, 1994, the Court of Appeals denied leave to appeal. *People v. Campbell*, 83 N.Y.2d 965, 616 N.Y.S.2d 17, 639 N.E.2d 757 (1994).

Petitioner filed this application for a writ of habeas corpus on April 10, 1997, claiming he was deprived of his right to a public trial by the trial court's closure of the courtroom during the testimony of an undercover police officer. Petitioner's claim is without merit.

During petitioner's trial, the court conducted a hearing on the prosecutor's request to close the courtroom during the testimony of the undercover police officer from whom petitioner bought crack. At the hearing, the undercover officer testified that she was, at that time, assigned as an undercover officer in Queens County and that she had cases pending in court. She also testified that she had lost subjects from prior investigations. The undercover officer stated that steps had been taken to conceal her identity when arriving in the courtroom, and explained that if her identity became known it could effect both her

usefulness as an undercover officer and her safety and the safety of other officers. Based on this testimony, the court closed the courtroom for the testimony of the undercover officer, concluding that "there is sufficient indication here that the safety of this witness would be placed in jeopardy if she testified in an open courtroom." Record ("R") 15.

In support of his petition, petitioner's counsel cites *Ayala v. Speckard,* 131 F.3d 62 (2d Cir.1997) (*en banc*), *cert. denied,* — U.S. —, 118 S.Ct. 2380, 141 L.Ed.2d 747 (1998). The Assistant District Attorney also cites *Speckard,* but relies upon *Vaughn v. Artuz,* 1998 WL 538117 (2d Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 142, 142 L.Ed.2d 116 (1998), a case which, while it appears to support her proposition, should not have been cited by the Assistant because it is a summary order.

■ Although the state court's record was, in my view, sufficient, I determined to supplement the record to clarify any ambiguity in the undercover officer's testimony. A habeas court has discretion to further develop the record to clarify ambiguities in the trial transcript. *See Tankleff v. Senkowski,* 135 F.3d 235, 250 (2d Cir.1998) (holding that habeas court has discretion to develop record further to determine whether a *Batson* objection was properly rejected). As a result of this additional inquiry, the undercover officer indicated to the Assistant District Attorney that she had, in fact, returned to the "same geographic area from which she had purchased drugs from petitioner." Byrne Aff., ¶ 5; Hinds Aff., pp. 1–2. While this statement does not define the term "same geographic area," I take it to encompass at least the same location referred to at the courtroom closure hearing, (*see* R. 11), an area later determined to encompass a two-mile stretch of Jamaica, Queens, an area with a large amount of drug trafficking, and an area that the New York Appellate Division for the Second Department con-

cluded was "near the courthouse." *People v. Campbell,* 204 A.D.2d 474, 614 N.Y.S.2d 170 (2d Dept.1994). While this might encompass a fairly large geographic area, it certainly was not unreasonable for the state court judge to find that the risk to the officer's safety was a "serious" one, and there was, therefore, an overriding interest in the closure of the courtroom. *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Ayala v. Speckard,* 131 F.3d at 70.

■ Furthermore, even if, with the benefit of hindsight, I were to conclude that the risk to the officer's safety was remote and, therefore, her fear was unreasonable, I should still reach the same conclusion. *Cf. Woods v. Kuhlmann,* 977 F.2d 74, 77–78 (2d Cir.1992) (despite the lack of specific findings of fact by the trial court, the "information gleaned" from the record was "sufficient to support the partial, temporary closure of petitioner's trial"). In my view, the state has an interest in the psychological well-being and the morale of police officers who are being asked to put their lives on the line for public safety in undercover operations. This concern ought to be candidly acknowledged and appreciated by courts. Accordingly, if there is any reasonable possibility that an officer's work would take him or her back to the same area, a prima facie case for an "overriding interest" in excluding the public during the undercover officer's testimony should be deemed to have been established. The burden should then shift to the defendant to indicate why in that particular case—as distinguished from the general interest in having open courts—there is a need for participation by the public in that trial. Consideration can then be given to alternative means of balancing the particular interests involved. The balancing, however, would be made not in terms of an abstract clash of rights, but rather in terms of the concrete concerns of the particular case.[1]

---

1. The Second Circuit has emphasized that

"the more extensive is the closure requested,

It has been suggested that such particularized balancing should take into account the possibility that a courtroom audience will be comprised of members of the community who know the parties and have firsthand knowledge of the facts at issue. The fear of being contradicted by such members of the courtroom audience, at one time, was thought to create an incentive for witnesses to be truthful. This notion, however, born in the " 'earlier days of England, when *attendance at court* was a common mode of passing the time for all classes of persons,' " like feudalism, no longer has any relevance in contemporary society. *See Brown v. Kuhlmann,* 142 F.3d at 535 (quoting 6 Wigmore, *Evidence* § 1834 at 435–36 (Chadbourne rev.1976) (emphasis in original)). The idea that a community member will happen to be spectating in open court on the day that a witness is testifying about matters within the spectator's firsthand knowledge is not a realistic one, nor one that a testifying witness would be likely to consider in shaping his or her testimony. *See id.*

A more realistic, though still remote, example, is the following: A defendant wants to make a showing that an officer was not even present when the officer allegedly bought drugs from the defendant. During his or her pretrial investigation, defendant's counsel learns of persons from the neighborhood who were in the area at the time the sale was alleged to have occurred. In that instance, these identifiable potential witnesses to the alleged sale should be permitted, in court, to view the undercover officer so that these persons could confirm, before testifying, whether or not the officer was present. In this example, there is a genuine need for opening the courtroom—at least for that limited purpose. Of course, defense counsel would be required to have a good faith

basis to question that the officer testifying was not actually present at the time and place of the alleged sale.

In addition, in performing a balancing test, it should not be forgotten that in these cases there is a jury present who in some real sense represents the public in this process. This also goes a long way toward assuring that the values protected by the right to a public trial are preserved. Indeed, the presence of a jury is "an effective restraint on possible abuse of judicial power," *In re Oliver,* 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948), and has the added salutary effect of discouraging perjury. *See Waller v. Georgia,* 467 U.S. at 46, 104 S.Ct. at 2214. Where a jury is present and the transcript of the undercover officer's testimony is available for the public and press to read, the closure is, indeed, limited, and the specter of the "secret trial" is not invoked. *See Ayala,* 131 F.3d at 72. *Cf. People v. Jones,* 47 N.Y.2d 409, 413, 418 N.Y.S.2d 359, 362, 391 N.E.2d 1335 (1979) ("the concept of a secret trial is anathema to the social and political philosophy which motivates our society...."). Indeed, as the Second Circuit noted in *Brown v. Kuhlmann:*

> unlike *In re Oliver,* which involved a summary criminal contempt trial held in secret before a "one-man grand jury," or *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), where a hearing on the admissibility of evidence was closed to the public, petitioner's trial was never completely closed to the public because he was tried before a jury composed of [ ] representatives of the community ... who may have outnumbered the handful of spectators in the courtroom ... the closure here was partial not only because it involved a few minutes of trial testimony, the transcript of which was available to the public, but

the greater must be the gravity of the required interest and the likelihood of risk to that interest." *Brown v. Kuhlmann,* 142 F.3d 529, 538 (2d Cir.1998) (quotations omitted). The Second Circuit then noted that this positive correlation "works in both directions." *Id.* Thus,

where the closure at issue was brief, the State's burden is "not a heavy one, and the limited likelihood that the undercover officer's safety would be prejudiced by an open courtroom ... ha[s] sufficient weight in the balance." *Id.*

also because it did not wholly exclude representatives of the community.

*Brown,* 142 F.3d at 536.

■ Finally, here, the trial judge, upon determining that limited closure was warranted as an alternative to complete closure of the courtroom, had no independent obligation to consider *sua sponte* further alternatives to the one deemed appropriate. *See Ayala v. Speckard,* 131 F.3d 62 (2d Cir.1997) (*en banc* ). Once the court made a determination to exclude the public during consideration of the officer's testimony, "it [became] the obligation of the party objecting to the trial court's proposal to urge consideration of any further alternatives that might avoid the need for even a limited closure." *Id.* (citing *People v. Ramos,* 90 N.Y.2d 490, 500–05, 662 N.Y.S.2d 739, 744–48, 685 N.E.2d 492 (1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 574, 139 L.Ed.2d 413 (1997)).

In any case, the state court's conclusion was not an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). A certificate of appealability will not issue since petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. The Clerk of the Court is directed to enter judgment and close the case.