State of New York
Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 42
The People &c.,
        Respondent,
    v.
Hanza Muhammad,
        Appellant.

Paul J. Connolly, for appellant.
Bradley W. Oastler, for respondent.

RIVERA, J.:

The trial judge is in charge of the courtroom and is ultimately responsible for ensuring that any limitation on a defendant's right to a public trial conforms with constitutional dictates. At defendant's trial, the judge delegated to court officers the

- 1 -

implementation of the judge's general policy of prohibiting the public from entering or exiting the courtroom while a witness testifies. We agree with the Appellate Division that members of the public were excluded from the courtroom at a time when they should have had access under the terms of the extant policy. But, contrary to the Appellate Division's conclusion, that error directly resulted from the acts of court officials enforcing the trial judge's order. Therefore, the court violated defendant's right to a public trial.

I.

A.

During defendant Hanza Muhammad's trial for second-degree murder and second-degree criminal possession of a weapon, the judge continued his policy that no person would be permitted to enter or exit the courtroom while a witness testifies. The judge consistently applied this policy in each trial he conducted "because [he] believe[d] that spectator traffic during the course of testimony is distracting to the witnesses, the attorneys, certainly the jurors, and [the] court reporter." Defendant did not object to the policy.

On the morning of the third day of trial and second day of testimony, several members of the victim's family and defendant's supporters began arriving at the courtroom doors around 8:50 a.m. In accordance with the court's rule, they turned in their cellular phones to the court officer standing outside the courtroom doors in anticipation of being allowed entry when the court opened. They then waited in the hallway directly across from the officer.

At approximately 9:40 a.m. the prosecution's witness was escorted by investigators through the doors and into the courtroom. By this time, several individuals had arrived and

were standing or sitting across from the courtroom doors. Before the witness entered, individuals from the prosecutor's office, as well as defense counsel and several court officers, periodically entered and exited the courtroom.

After the prosecution completed the direct examination of the witness, and a few minutes into defense counsel's cross examination, the prosecutor learned and immediately informed the court that several members of the public were waiting in the hallway. The trial judge interrupted the proceedings and ordered the jury out of the courtroom to allow the public waiting outside to enter. Once the public was seated inside, the trial judge recalled the jury and defense counsel continued with the cross examination.

B.

The following day, after several off-the-record discussions with counsel, the trial judge held a full-day fact-finding hearing on the prior morning's implementation of the judge's general policy. The judge called three witnesses. First, the court officer assigned to collect mobile phones from observers wishing to enter the courtroom testified that she knew the trial judge's policy was that no one could enter or exit while a witness was on the stand. However, she did not hear the jury enter the courtroom and did not know when the witness started to testify, although she observed the witness as he was escorted into the courtroom. Her only conversations with the public were to instruct a couple of persons to turn their shirts inside out and another to put a lanyard hanging around their neck inside their shirt. She did not observe any individual being prevented from entering the courtroom but acknowledged that she did not communicate to anybody that the courtroom was open.

She further testified that nobody in the hallway asked to enter the courtroom. The court officer explained that "[i]t was like they were just standing there waiting, and this was before I took their phones, and then I announced – I said, 'it should be soon, let me take your phones so there's not a big rush.' " The court officer acknowledged that when people are waiting to enter the courtroom they usually sit on the bench across the hallway and, thus, the persons in the hallway that morning may also have been waiting for permission to enter:

> "Q:    So would it be fair to say that they assumed that until you give them affirmative permission to come in the courtroom that they have to stay out?
>
> A:     I assume, but I can't be sure.
>
> Q:    Okay. And maybe not you giving them permission but some court officer giving them permission to enter?
>
> A:     I – I would assume."

Two other court officers who were stationed inside the courtroom that morning also testified. One officer stated that the courtroom was open by 8:50 a.m. and that he brought in the jury at approximately 9:00 a.m. Although he testified that he did not prevent anyone from entering the courtroom or observe another officer do so, he acknowledged that he "had no idea what happened at the front door." The other officer testified that, upon instruction from the judge, he opened the doors between 8:45 and 8:50 a.m. and informed the court officer stationed in the hallway that the courtroom was open and the public could enter. At that moment, he noticed two people sitting on the bench outside the courtroom door and told them they could enter, but they responded that they were attending a different

trial next door. The court officer then resumed his position inside, next to the bench and witness stand. He did not lock the door or have knowledge of anyone else doing so and did not himself observe another court officer prevent anyone from entering. He acknowledged that he could not see the hallway from his position but could see shadows or some people standing outside through the door window. After the court stopped the testimony and ordered the public to be admitted, the officer observed approximately 20 to 25 people enter the courtroom.

The prosecutor called three witnesses associated with the District Attorney's Office who attended the trial that morning strictly as observers. Another prosecutor who was not assigned to defendant's case testified that he arrived around 10 a.m. and noticed a group of people waiting outside the courtroom in the hallway. Upon his request, court staff permitted him to enter an anteroom immediately past the front doors but outside the courtroom to observe the trial through a crack in the inner doorway. He saw a witness on the stand and, after about five minutes, sent the following text to the prosecutor inside: "Is it a problem that the defendant's family was kept out of the courtroom for the nonmaterial witness? Court staff is buzzing out here about it." After the doors were opened, people began entering the courtroom and the prosecutor followed them in. Next, a summer intern in the District Attorney's office testified that she freely entered and exited the courtroom that morning. Specifically, when she first arrived just before 9:00 a.m. she entered the courtroom and observed someone being arraigned. She then exited and returned a few minutes later—walking straight by the officer at the door—and sat inside before the witness took the stand. She acknowledged that others had to line up and surrender their phones at

the desk outside the courtroom doors before entering. Lastly, a Syracuse police officer testified that he arrived just before 9 a.m., before the trial commenced, and observed the victim's stepmother and other family members sitting on the bench outside the courtroom. Because he knew the stepmother, he approached and spoke with her briefly, telling her he was going to observe the trial. He then walked into the courtroom and saw the witness take the stand.

Defendant called four witnesses who had been waiting outside the courtroom the prior morning. Defendant's witnesses generally testified that they were aware of the court's policy against entering and exiting the courtroom during witness testimony because they were in court on the prior days when the court announced the policy. Two of the victim's family members testified that a court officer told them they could not enter the courtroom. Those witnesses also testified that, while they were waiting in the hallway, the only people they saw enter the courtroom were well-dressed White individuals who looked like interns. One of the victim's family members testified that she waited in the hallway to be "respectful." She further testified she believed the court staff knew she would want to come into the courtroom as soon as it was open and waited for their permission to enter. Defendant's friend testified it was her understanding that the court officer collecting phones would tell her whether she could enter the courtroom at the time she handed in her phone. Defendant also called a police sergeant who arrived in the hallway after the witness testimony began. She testified that she peeked in the courtroom, saw that a witness was testifying, and kept people in the hallway because she did not receive "any indication from the courtroom that the doors [we]re open to the public."

The court, defendant and the attorneys then viewed the hallway surveillance video. Although it has no audio, the video clearly depicts, among other things, that beginning at 8:58 a.m. a person arrived and sat on the bench directly across from the courtroom doors and the court officer assigned to collect phones. At approximately 9:06 a.m., several mostly African American individuals began arriving and approaching the court officer standing at a table directly outside the courtroom doors. After turning in their phones to the officer, they sat and stood in the hallway directly across from the courtroom. Eventually at around 10:20 a.m., court officers waived in the crowd that was waiting. The White individuals, along with two or three African American individuals dressed in business attire, walked around the court officers standing in front of the doors and entered without further detainment while the court officers screened the African American individuals who were waiting near the bench with hand-held metal detectors and checked their bags before permitting them entry to the courtroom.*

Following the hearing, the trial judge denied defendant's motion for a mistrial, holding that the court neither explicitly nor implicitly excluded members of the public during the testimony of a witness and that court officers did not exclude anyone from the courtroom when a witness was not testifying. The trial judge determined that defendant's witnesses at the hearing did not try to gain access to the courtroom and instead waited

---

* There is no indication in the record that the trial judge was aware anyone was waiting in the hallway until he was so informed by the prosecutor.

outside, apparently assuming that access was not permitted. Thus, defendant was not deprived of his constitutional right to a public trial.

C.

The jury convicted defendant on both counts. The Appellate Division affirmed (206 AD3d 1580 [4th Dept 2022]). As relevant here, unlike the trial judge, the Appellate Division determined that "people were excluded from the courtroom" (*id.* at 1582). However, because the exclusion was caused "not by any affirmative act of the court, but instead by a confluence of factors outside the court's knowledge and control," the trial court did not violate defendant's right to a public trial (*id.*). Although the Appellate Division "d[id] not approve of the [trial] court's standing policy of essentially locking the courtroom doors while witnesses are on the stand," it did not address the issue because defendant failed to object at trial or challenge the policy before the Appellate Division (*id.* at 1581). A Judge of this Court granted leave to appeal (39 NY3d 941 [2022]). We now reverse.

II.

Defendant claims that his Sixth Amendment right to a public trial was violated by exclusion of members of the public because the trial judge failed to put in place procedures to ensure that those who timely arrived in compliance with the judge's policy were permitted entry. We conclude that the exclusion of members of the public found by the Appellate Division was a direct result of the trial judge's affirmative acts and his staff's

implementation of the general policy which, in turn, violated defendant's right to a public trial.

A.

The Sixth Amendment right to a public trial is a "fundamental privilege of the defendant in a criminal prosecution" (*People v Martin*, 16 NY3d 607, 611 [2011]). " ' " ' The requirement of a public trial is for the benefit of the accused; that the public may see that [the accused] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep [the accused's] triers keenly alive to a sense of their responsibility and to the importance of their functions' " ' " (*Waller v Georgia*, 467 US 39, 46 [1984], quoting *Gannet Co., Inc. v DePasquale*, 443 US 368, 380 [1979], in turn quoting *In re Oliver*, 333 US 257, 270 n 25 [1948], in turn quoting T Cooley, Constitutional Limitations 647 [8th ed 1927]). "In addition to ensuring that judge and prosecutor carry out their duties responsibly, a public trial encourages witnesses to come forward and discourages perjury" (*id.*). Under rare circumstances, this fundamental right may give way to "other rights or interests" (*Waller*, 467 US at 45). However, "the presumption of openness is not easily overcome" (*People v Colon*, 71 NY2d 410, 415 [1988]). In sum, "an affirmative act by the trial court excluding persons from the courtroom" without lawful justification constitutes a violation of the defendant's right to a public trial (*People v Peterson*, 81 NY2d 824, 825 [1993]). And in such case, reversal of the defendant's conviction is mandated because it "is the only realistic means to implement this important

constitutional guarantee" (*see Martin*, 16 NY3d at 613; *see also People v Jones*, 47 NY2d 409, 417 [1979]; *People v Jelke*, 308 NY 56, 67-68 [1954]).

B.

It is undisputed that the trial judge applied his general courtroom closure policy at defendant's trial that no one could enter or exit during testimony and that the judge delegated the policy's implementation to the court officers. Unquestionably, the officers did not properly execute that policy here, as several members of the public who appeared at the courtroom doors before the witness's testimony started were excluded until after the prosecutor's direct examination and the first minutes of the cross examination. Thus, the Appellate Division properly concluded that members of the public "were excluded from the courtroom" (206 AD3d at 1582). However, contrary to the Appellate Division's further conclusion, the exclusion resulted from at least two affirmative acts by the trial judge—the adoption of the policy and its delegation to his staff—and thus the judge caused the unjustified exclusion.

As with all matters concerning the administration of the courtroom, the trial judge was responsible for properly implementing the policy under its "inherent authority and the affirmative obligation to control conduct and decorum in the courtroom, in order to promote the fair administration of justice for all" (*People v Nelson*, 27 NY3d 361, 367 [2016]; *see Jelke*, 308 at 63). The trial judge here recognized the same and relied on this power over courtroom administration as the source of his authority for adopting his general policy. When the judge delegated implementation of the policy to the court officers they, in turn, acted at his direction as his agents. The Sixth Amendment requires trial courts "to

take every reasonable measure to accommodate public attendance at criminal trials" (*Presley v Georgia*, 558 US 209, 215 [2010]), and the court was required to do more than the record reveals here such that its policy was properly implemented. The judge's failure to do so caused an exclusion of members of the public without justification and, therefore, violated defendant's right to a public trial (*see e.g. People v Moise*, 110 AD3d 49, 52 [1st Dept 2013]).

That no officer physically prevented anyone from entering at a time when a witness was not testifying misses the point that members of the public were excluded as a direct consequence of the implementation of the judge's policy. Contrary to the judge's suggestion, it was not the responsibility of the members of the public to ask the officers if the courtroom was open. Indeed, under the circumstances why would they? Logically, once they turned in their phones or adjusted their attire as directed by the court officer standing in front of the courtroom doors, they would have rightly expected, and waited, until further instruction as to whether and when they could enter.

This did not escape the only court officer stationed outside the courtroom, who testified that she assumed persons waiting in the hallway would have understood that they could not enter without affirmative permission. Her fellow officer apparently labored under the same assumption because upon opening the courtroom that morning, he immediately informed two people waiting directly across the hallway that they could enter. Furthermore, as the surveillance video clearly depicts, the individuals waiting across the hallway were ultimately allowed entry only after undergoing a security check, which suggests a shared understanding that they could not simply walk through the doors into the courtroom after

turning in their phones. Given these facts and the officers' failure to notify those waiting in the hallway that they could enter—for example, by verbal communication or placing a sign indicating the courtroom was open—those individuals were unjustifiably excluded from the courtroom at a time when the courtroom should have been open.

The prosecution's reliance on *Peterson* is misplaced. In *Peterson*—and *Colon* (71 NY2d at 410) and *People v Glover* (60 NY2d 783 [1983]) cited therein—no person was excluded pursuant to the court's rule (*see Peterson*, 81 NY2d at 825 [holding that "(a) denial of the public trial right requires an affirmative act by the trial court excluding persons from the courtroom," and a "brief and inadvertent continuation of a proper courtroom closing, which was not noticed by any of the participants, did not violate defendant's right to a public trial"]; *Colon*, 71 NY2d at 416 [holding that locking the courtroom doors during the jury charge does not constitute a "closure" because "the trial court's action . . . does not explicitly exclude anybody"]; *Glover*, 60 NY2d at 785 [holding that closure of the courtroom did not deny defendant's right to a public trial where "(t)here (wa)s no indication that the court excluded or intended to exclude any member of the public who sought to attend the trial"]). Here, members of the public were in fact excluded, and as we have explained above, that exclusion tracks back to the trial judge's policy.

Our decision on this issue renders it unnecessary for us to address defendant's remaining claims. And although we have considered defendant's challenge to the public exclusion based on the policy as implemented, our holding should not be interpreted as an endorsement of the trial judge's general policy prohibiting ingress and egress during witness testimony. As in *Colon*, we have no occasion, at this time, to consider "the

propriety of routinely locking the doors during other portions of the trial" (71 NY2d at 417).


### III.

We conclude that, because the trial judge adopted the policy of routinely prohibiting entry to the courtroom, he ultimately bore responsibility for its proper implementation. The misapplication of the judge's policy led to an unjustified exclusion of the public and therefore violated defendant's right to a public trial.

Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.

GARCIA, J. (concurring):

I agree that, under the unique facts of this case, defendant's right to a public trial was violated, and that defendant is therefore entitled to a new trial. Defendant did not preserve an objection to the propriety of the trial court's general policy prohibiting

spectator traffic during witness testimony, and therefore the issue of whether that policy is a "reasonable restriction upon the time and manner of public access to the trial" is not before us (*see People v Colon*, 71 NY2d 410, 416-417 [1988]).  I would hold, however, that the court's implementation of that policy here resulted in an unconstitutional closure.

"Trial courts have the discretion to exclude the public, although they must exercise that discretion 'sparingly . . . and then, only when unusual circumstances necessitate it' " (*People v Jones*, 96 NY2d 213, 216 [2001], quoting *People v Martinez*, 82 NY2d 436, 441 [1993]).  The court must be " 'careful enough' " to ensure " 'that the defendant's right to a public trial is not being sacrificed for less than compelling reasons' " (*People v Peterson*, 186 AD2d 231, 232 [2d Dept 1992], *affd*, 81 NY2d 824, quoting *People v Jones*, 47 NY2d 409, 414-415 [1979]).  The record from the hearing below establishes that, due to a miscommunication in the court officers' enforcement of the court's policy, officers prevented the public from entering the courtroom during a period that the courtroom should have been open pursuant to the court's policy.  That exclusion was more than an "inadvertent lapse" resulting in a "continuation of a proper courtroom closing" (*see People v Peterson*, 81 NY2d 824, 825 [1993]).  Rather, court personnel affirmatively kept out members of the public before the proceedings began and that closure continued for a significant period.  The closure, though mistaken, cannot be deemed inadvertent.

Order reversed and a new trial ordered. Opinion by Judge Rivera. Chief Judge Wilson and Judges Cannataro, Troutman and Halligan concur. Judge Garcia concurs in result in an opinion, in which Judge Singas concurs.

Decided May 23, 2023